## WIERSE et al. v. UNITED STATES et al.

(Circuit Court of Appeals, Fourth Circuit. May 7, 1918.)

### No. 1586.

1. CONSPIRACY ⬥48—PROSECUTION—EVIDENCE—QUESTION FOR JURY.
   In a prosecution under Criminal Code, § 37, for a conspiracy to sink a German merchant vessel in the navigable waters of the United States, etc., evidence *held* sufficient to carry the case to the jury

2. CRIMINAL LAW ⬥789(2)—INSTRUCTIONS—SUFFICIENCY.
   In a prosecution against a naturalized citizen of German origin and another a subject of the German Empire for conspiracy to sink a vessel in navigable waters, etc., the charge *held* to sufficiently safeguard the rights of the naturalized citizen as to the question of reasonable doubt and the treatment he should receive at the hands of the jury, notwithstanding alienage of his coconspirator.

3. CONSPIRACY ⬥45—TO SINK VESSEL—EVIDENCE—ADMISSIBILITY.
   In a prosecution under Criminal Code, § 37, for conspiracy to sink a German vessel in navigable waters of the United States, etc., evidence as to the condition of the ship, and that the valves were open, etc., *held* admissible; the injury to the equipment of ship contributing to the sinking.

4. CRIMINAL LAW ⬥178—FORMER JEOPARDY—DISMISSAL.
   That a defendant had previously been indicted with others who were acquitted, will not support a plea of former jeopardy, where such defendant was not tried on account of his illness, and after trial the case against him was dismissed without prejudice to any charge that might be made against him.

5. CRIMINAL LAW ⬥338(7)—PREJUDICE OF JUDGE—EVIDENCE.
   A defendant, who complains that he cannot obtain a fair trial on account of prejudice or bias of the judge, must apply for a transfer in ac-

⬥For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

cordance with Judicial Code, § 21, and where no such application has been made, a defendant cannot introduce evidence of an otherwise collateral matter for the purpose of discrediting the judge and attempting to show his animus.

In Error to the District Court of the United States for the Eastern District of South Carolina, at Charleston; Henry A. Middleton Smith, Judge.

Paul Wierse and Johann Klattenhoff were convicted, under Criminal Code, § 37, of a conspiracy to sink a German merchant ship in the navigable channel of a river leading from the port of Charleston, etc., and they bring error. Affirmed.

John P. Grace, of Charleston, S. C., for plaintiffs in error.

Francis H. Weston, U. S. Atty., of Columbia, S. C. and J. Waties Waring, Asst. U. S. Atty., of Charleston, S. C., for defendants in error.

Before PRITCHARD, KNAPP, and WOODS, Circuit Judges.

PRITCHARD, Circuit Judge. This is a criminal action, instituted in the District Court of the United States for the Eastern District of South Carolina, wherein the United States is plaintiff against Paul Wierse, Johann Klattenhoff, and W. Mueller, charging the defendants with a conspiracy to sink, or to cause to be sunk, or to permit to be sunk, a German merchant ship, and the actual sinking of the ship in pursuance of such conspiracy in the channel of Cooper river, leading from the harbor of Charleston, which is a navigable channel of the United States, in violation of section 37 of the Criminal Code (Act March 4, 1909, c. 321, 35 Stat. 1096 [Comp. St. 1916, § 10201]). The case was tried on the 10th day of October, 1917. The defendant Mueller has never been arrested and is reported to have left the United States. The defendants Wierse and Klattenhoff were tried and convicted and sentenced. The case now comes here on writ of error.

The facts may be epitomized as follows:

On January 30, 1917, a telegram was sent by W. Mueller, the then German consul at Atlanta, Ga., to E. H. Jahnz, who was at that time German consul at Charleston, S. C., in German, the translation of which is as follows:

"Please wire whether Wierse has received my letter of last Saturday."

On January 31st a telegram was sent by E. H. Jahnz to W. Mueller, in English, as follows:

"Wierse claims letter has been sent must be in Atlanta by now."

That night at 8:45 Wierse telegraphed to Mueller:

"Congratulations."

Johann Klattenhoff was the master or captain of the German merchant steamship Liebenfels which was then lying in the harbor of Charleston. He had been absent from his ship for some days on a visit to a friend of his, William Andel, who resides on John's Island, about 35 miles by automobile road from the city of Charleston. Klattenhoff was not expected to return to the ship until the end of the

week, or perhaps later. On receipt of the telegram from Mueller, Wierse engaged an automobile to take him to Andel's place, and also obtained leave of absence from his work, requesting that some one else take care of it that day and evening, as he might not be back. During the automobile trip he mentioned to the driver of the car that the captain (Klattenhoff) might come back with him. He did not, however, disclose the reason for his trip, but did urge haste. Upon his arrival at Andel's, Wierse conferred with Klattenhoff, and the two returned together to Charleston in the automobile. They came by a bridge across the Ashley river to the city of Charleston, and, after they had traveled about two blocks, Wierse had the automobile stopped and got out of it, stating that he would take a street car. The automobile had been engaged by Wierse, and the cost for its use was charged to him. The place where he got out was about a mile from his residence, where he stated he was going. Klattenhoff remained in the automobile, and was taken directly to the wharf used as a landing place by the crew of the Liebenfels. The automobile driver then returned to his garage, which is about three blocks from Wierse's residence.

Wierse appears to have gone to his residence, and from there directly to his office at the Charleston American, a newspaper, where he was employed as state editor and editorial writer. He there wrote a telegram, addressed to Mueller, the German consul in Atlanta, and, taking it to the nearest telegraph office, which was situated in the Argyle Hotel, about two city blocks from the newspaper office, had it sent. This telegram consisted of the single word, "Congratulations." It was sent to the German consul at Atlanta, collect.

Klattenhoff, after leaving the automobile went on the wharf and was carried over to the Liebenfels. Upon his arrival on board ship he ordered the crew to damage and sink her; but they at first did not comply with this order, demanding some more tangible form of orders. Later Klattenhoff left the ship and went ashore, going to Wierse's office, where he conferred with him. From there on his way back to the ship he met a member of the crew and informed the latter that he had been back for "more information." He then went aboard the Liebenfels, and, upon further orders being issued, the crew carried out his instructions, and thereupon demolished the machinery and other operative parts of the ship, and opened the sea valves, which admitted water into the vessel. The ship then sank. She was lying in the navigable channel of the Cooper river, used by most of the shipping coming into the port of Charleston, and the channel which leads up the river to the United States Navy Yard.

[1] The first assignment of error raises the question as to whether the court below erred in refusing to direct a verdict in favor of the defendants "on the ground that it was not shown that the defendant Wierse knew that the vessel was to be sunk in the navigable waters, even though it be admitted that he knew it was to be sunk." This assignment fairly presents the most important question at issue in this controversy. It rarely ever occurs, where parties are charged with conspiracy, that the prosecution is able to establish their guilt

by positive and direct testimony. From the very nature of things, conspiracy is a crime that is entered into secretly, and as a general rule, in the prosecution of cases of this character, the government must rely upon inferences to be drawn from the facts and circumstances surrounding the transaction. This is especially true in cases like the one at bar, where individuals are plotting against the government. The only possible hope they have of succeeding is in keeping their motives and actions concealed from the public. Therefore, in order to determine as to whether a conspiracy was entered into as alleged, we must consider all the facts and circumstances surrounding this transaction, and base our conclusion upon such reasonable inference or inferences as may be drawn from the evidence.

It should be borne in mind that Wierse, a naturalized citizen of German birth, had been connected with a German newspaper; that he had been an intimate friend of the German consul at Charleston, S. C., and also with the German consul at Atlanta, Ga., and that he was well acquainted with Capt. Klattenhoff, the master of the Liebenfels. According to his own admission he had handled business and correspondence for Capt. Klattenhoff. It further appears from the evidence that he had been corresponding with Mueller, and that Mueller had telegraphed to Wierse that he was in accord with his proposition. It further appears that, upon receipt of the telegram, the defendant Wierse on his own account hired an automobile and went some distance in the country to see Capt. Klattenhoff, and after consulting with him brought him back to the city. It also appears that, as soon as Klattenhoff went on board the ship, the order was given to sink her. However, this order was not obeyed. Thereupon Klattenhoff left the ship and went directly to the office of the defendant Wierse. The fact that the German consul at Atlanta was so anxious to have the message which he transmitted to Capt. Klattenhoff delivered was within itself sufficient to have put the defendant Wierse upon inquiry as to the nature of the errand that he was called upon to make. The participation of Wierse up to and including the time that he made the visit to Klattenhoff, the cordial relations existing between the two and that which transpired after their return to Charleston, leads us to the conclusion that Wierse and Klattenhoff must have had some conversation as to the motive which prompted Wierse to visit Klattenhoff, and as to what Klattenhoff was expected to do when he returned to the ship.

It is insisted by counsel for defendant that, while Wierse admitted he hired the automobile at his own expense, he was to be reimbursed by the official representative of the Imperial German government. His willingness to incur this personal liability on behalf of that government tends to show that he was ready and willing to serve it. It is also significant that, when Wierse and Klattenhoff reached the city, Wierse, when about a mile distant from his home, got out of the machine and took a street car. Why did he deem it necessary to take a car at that point? Under normal conditions Wierse would have remained in the car until he reached his home. His conduct in this respect, when considered in connection with the other facts, was, we

think, sufficient to have warranted the jury in inferring that Wierse, knowing the purpose of Klattenhoff, was not willing to be seen with him, and also that leaving the automobile at that point would enable Klattenhoff to more speedily consummate the purpose for which the conspiracy was formed. It should also be borne in mind that the crew of the Liebenfels at first refused to obey the order of Capt. Klattenhoff to sink the vessel, whereupon Capt. Klattenhoff went to the office of Wierse and had a conference with him, after which he returned to the ship and the orders were promptly obeyed and the vessel sunk. If Wierse knew nothing about the purpose of Klattenhoff, and was not connected with the transaction, why was it necessary for Klattenhoff, before giving the final orders to sink the ship, to go to Wierse's office for another conference?

The fact that after Wierse reached his office he wrote a telegram containing the word, "Congratulations," which was immediately dispatched to the German consul at Atlanta, is very material. The defendant, through his counsel, insists that this telegram referred to the fact that some time before that date he had received a letter from the consul at Atlanta informing him that he was engaged to be married. There are two remarkable facts about this explanation, when considered in connection with the telegram. One is that he should have delayed sending his congratulations until that particular time, and the second is that he should have sent the telegram "collect." This, to our mind, is a most extraordinary circumstance. The evidence shows that letters had been passing between the two, and, knowing the consul as intimately as he did, one would naturally suppose that he would have written or telegraphed his congratulations immediately upon receipt of the information that his friend was to be married. It is also very significant that he should have sent this telegram "collect." To say the least of it, the sending of a telegram of congratulations "collect" was unusual, and not at all in harmony with what one would be expected to do under similar circumstances. We think the explanation as respects the sending of this telegram, instead of aiding the defendant in his contention, rather tends to strengthen that of the government.

Any one of these circumstances, taken alone, would not be sufficient to warrant a conviction of the defendant; but, as we have stated, in cases of this kind it is the duty of the jury to consider all the facts and circumstances together, in order that they may draw the proper inference. Therefore, in view of all the facts and circumstances of this case, we think the jury was amply warranted in reaching the conclusion that the defendant was a party to the conspiracy. Any inference other than this would not be in accord with our everyday observation and experience.

[2] The second assignment of error is in the following language:

"Because it appears that all the testimony was not sufficient to prove the guilt of the defendants beyond a reasonable doubt, and his honor, therefore, erred in not directing a verdict of 'not guilty'; the error being that 'beyond a reasonable doubt' means the exclusion of any other reasonable hypothesis of innocence, and the defendant Wierse was by no testimony or inference deducible from the testimony proven beyond a reasonable doubt to have intend-

ed to have conspired, or intended to conspire, in sinking the vessel in a navigable stream, the intention to sink in a navigable stream being one of the essential elements of the crime."

This assignment in the main is directed to the refusal of the court below to instruct the jury to return a verdict in favor of the defendant. However, it is also insisted that the court failed to instruct the jury that they could not convict the defendant, unless they were satisfied of his guilt beyond a reasonable doubt. A reference to the charge clearly shows that the latter part of the assignment is not borne out by the record; it, among other things, containing the following:

" * * * Then, gentlemen, I desire to charge you that in this case, as, in all other cases, the rule of law is that * * * every one comes into court with the presumption that he is innocent; that is the presumption in favor of a free citizen, whether man, woman, or child, charged with crime, when he comes into court he is presumed to be innocent (although he is put on trial) until his guilt is established by competent testimony, and established according to the meaning of the law beyond a reasonable doubt. Now, on that question of a reasonable doubt, I charge you that it does not mean that your conclusions must be free from all doubt. There is some doubt intermixed in all human conclusions, whether it is the verdict of a jury or the decree of a judge; nothing human is absolutely sure, or absolutely perfect, so that you can find a verdict of guilty although you have still some doubt, but it must not be a reasonable doubt. At the same time you must not be deterred by caprice, or a capricious doubt, or a whimsical doubt, or an unreasonable doubt, or a doubt for which you can assign to yourselves no reason. It must be a reasonable doubt existing, and in that case the defendant is entitled to the benefit of it. Again, as in this case, I will charge you now, these two parties who are before you are, one of them a subject of a foreign state, but he came here in free commerce on the invitation of this country for the purpose of commerce, and the other, although a foreign-born subject, under the laws and license of this country has been admitted to associate himself with the other citizens of this free commonwealth as a member of it, and therefore stands with the same rights and same privileges, although having the burden of the same duties as a native-born citizen of this country, but both of them in their trial in courts of justice in this country are entitled, upon the question of the establishment of their guilt, to the enforcement of the same rules which would be enforced against native-born citizens. The yardstick of justice has neither increase nor diminution in measuring what should be allotted to them than it would be in allotting to the highest and most patriotic citizen of this country. * * *"

Thus it will be seen that the court carefully safeguarded the rights of the defendant, both as to the question of a reasonable doubt and as to the treatment that he should receive at the hands of the jury, notwithstanding the fact that his coconspirator, Klattenhoff, is a subject of the German Empire.

[3] By the third assignment of error it is insisted that the court below erred in permitting the government to introduce testimony showing the general condition of the ship, and, among other things, that the machinery and gear were broken at the time the valves were opened. Counsel for defendant insisted that this testimony was irrelevant and had no relation to the sinking of the vessel. It is a matter of common knowledge that the machinery of other German merchantmen in ports of the United States had been damaged, but so far as we know the Liebenfels was the only ship that was actually sunk. The ship being anchored in the channel which was being used for private and

governmental shipping clearly indicates the intent of the parties, and shows most conclusively that those engaged in the conspiracy were well acquainted with the local situation, and knew where to strike the most vital blow in order to effectively hinder and delay the government in its operations.

It is a fact of which this court will take judicial notice that at that time it was the policy of the Imperial German government to disable all the ships that she had in our ports, by dismantling the machinery and doing those things that were calculated to render such ships practically worthless. The defendant Wierse being a man of intelligence, it is but fair to assume that he well understood the importance of this move on the part of the controlling power of his native land. Undoubtedly the destruction of the engine, including the valves and other appliances for the control of water in the engine room, contributed to the sinking of the vessel. Likewise the destruction of the steering gear and wireless and engine room telegraphic systems prevented signals being sent out for help, and also rendered the ship incapable of being steered out of the channel. The defendants being charged with conspiring to sink the vessel in a navigable channel, this evidence bore directly upon the question of intent, and therefore became very material in the trial of the case. This rule is of long standing and well established by the courts.

In the case of Schultz v. United States, 200 Fed. 234, 118 C. C. A. 420, the Circuit Court of Appeals for the Eighth Circuit, in referring to this question, said:

"If intent, motive, knowledge, or design be one of the elements of the crime charged, and especially if it is claimed that the crime was committed in accordance with a system, plan, or scheme, evidence of other like conduct by the defendant at or near the time charged is admissible. Brown v. United States, 142 Fed. 1, 73 C. C. A. 187; Dillard v. United States, 141 Fed. 303, 72 C. C. A. 451; Walsh v. United States, 174 Fed. 615, 98 C. C. A. 461; Ex parte Glaser, 176 Fed. 702, 100 C. C. A. 254; Thompson v. United States, 144 Fed. 14, 75 C. C. A. 172, 7 Ann. Cas. 62."

There are numerous other cases to the same effect, notably among them being Wood v. United States, 16 Pet. 342, 10 L. Ed. 987. Therefore we think that this assignment is without merit.

[4] The fourth assignment of error relates to the refusal of the court below to permit the introduction of records of another case in which Klattenhoff had been the defendant. It is insisted that this evidence was offered for the purpose of showing that Klattenhoff had once been in jeopardy for this offense. This, we think, should have been taken advantage of by a plea of former jeopardy, which was not entered. While it is true that upon a former trial Klattenhoff and eight other members of the crew of the Liebenfels were indicted for a conspiracy to sink the ship, the members of the crew being acquitted, Klattenhoff was not tried at the time on account of illness, and after the trial the case against Klattenhoff was dismissed without prejudice to any charge that might be made against him. The fact that he was indicted with other defendants, who are not defendants in this action, and where the case as to him was dismissed, would not avail him on a plea of former jeopardy.

[5] The fifth assignment of error is in the following language:

"Because his honor, the presiding judge, erred in not allowing defendant's counsel, over objection duly and properly made to ask the following question: 'Q. The success of the Charleston American had been very remarkable, had it not? A. Absolutely so'—the error being that such testimony would have cleared up in the minds of the jury the animus of the prosecution by showing the connection between the district attorney's office and the Evening Post, a rival and contemporary of the Charleston American, the success of which had touched a very sensitive cord."

We cannot understand upon what theory evidence as to the success or failure of the Charleston American would be relevant or material in this instance. Assuming it could have been shown that the American as a paper had been very successful, that fact could throw no light upon the guilt or innocence of the defendant. The introduction of such testimony could only have tended to confuse the minds of the jury, without affording them any information upon the question which they were called upon to decide. For instance, if it had been shown that the success of this paper had been phenomenal such fact could in no wise have justified the defendants in entering into this conspiracy. It is apparent from the record that this evidence was offered as an entering wedge for the purpose of dragging the name of the trial judge into this case in a personal way, a practice which is reprehensible in the highest degree and should never be resorted to by any reputable attorney. The references of this character to the trial judge contained in the brief are irrelevant, scandalous, and impertinent, and the court orders that the same be stricken therefrom. Section 21 of the new Judicial Code (Act March 3, 1911, c. 231, 36 Stat. 1090 [Comp. St. 1916, § 988]) provides that, where a defendant feels that he cannot secure a fair and impartial trial on account of prejudice or bias, it shall be the duty of the judge, upon proper showing, to transfer the case to another judge for trial. The section in question is in the following language:

"Sec. 21. Whenever a party to any action or proceeding, civil or criminal, shall make and file an affidavit that the judge before whom the action or proceeding is to be tried or heard has a personal bias or prejudice either against him or in favor of any opposite party to the suit, such judge shall proceed no further therein, but another judge shall be designated in the manner prescribed in the section last preceding, or chosen in the manner prescribed in section twenty-three, to hear such matter. Every such affidavit shall state the facts and the reasons for the belief that such bias or prejudice exists, and shall be filed not less than ten days before the beginning of the term of the court, or good cause shall be shown for the failure to file it within such time. No party shall be entitled in any case to file more than one such affidavit; and no such affidavit shall be filed unless accompanied by a certificate of counsel of record that such affidavit and application are made in good faith. The same proceedings shall be had when the presiding judge shall file with the clerk of the court a certificate that he deems himself unable for any reason to preside with absolute impartiality in the pending suit or action."

This section was enacted for the purpose of enabling one who might in good faith feel that he could not obtain a fair and impartial trial before a particular judge to have his case transferred to another. If counsel for the defense thought at the time his client was called upon

to plead to this indictment, he would not be treated fairly and impartially, it was not only his privilege, but his bounden duty to his client, to have availed himself of the provisions of this statute. This court will not permit one of the high character and standing of the learned judge who tried this case in the court below to be assailed in one of its records in such an unjust and unwarranted manner, and this is especially true in a case like the one at bar, where counsel for defendant knew of the statute which we have quoted, and failed to avail himself of the opportunity to make any objections to the trial of his client before he was called upon to answer the charge.

A careful examination of the record shows that the trial judge gave no indication of any feeling, bias, or prejudice against the defendant Wierse. His conduct throughout the trial, including the charge, was absolutely fair, and, as we have already stated, safeguarded the rights of the defendant in every particular. It must be understood, once and for all, that where lawyers fail to exercise the right conferred upon them by the statute to object to the trial of their client by the presiding judge, they will not be permitted to come into this court and by innuendo or otherwise assail the character of the trial judge as to matters that have no relation whatever to anything that may have transpired during the trial. The rulings of the trial court are always subject to the most critical analysis, in order that we may ascertain as to whether any error of law or fact, as the case may be, has been committed, or whether the judge in the trial of the case has done or said anything to prejudice the rights of the defendant. Thus far lawyers may go, but no farther.

The personal references to the assistant district attorney in the brief for the plaintiff in error have no basis whatever in the record and are ordered to be stricken therefrom.

While there are 20 assignments of error, a careful consideration of those that we have not disposed of leads us to the conclusion that they are without merit. Therefore we do not deem it necessary to enter into a discussion of the same, feeling as we do that the defendants have had a fair and impartial trial and the ends of justice have been fully met.

Therefore the judgment of the lower court is affirmed.

☞For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes