### UNITED STATES v. THE PIETRO CAMPANELLA.

### SAME v. THE EURO.

Nos. 2498, 2499.

District Court, D. Maryland.

April 7, 1942.

See also, D.C., 41 F.Supp. 656.

Bernard J. Flynn, U. S. Atty., of Baltimore, Md., and H. B. Finn, Sp. Asst. to Atty. Gen., for the United States.

Homer L. Loomis, of New York City, and Hilary W. Gans, of Baltimore, Md., for claimants.

CHESNUT, District Judge.

In March 1941 a number of Italian privately owned vessels were anchored in various Atlantic ports of the United States. On orders of the Naval Attache of the Italian Embassy to this country, the masters and crews of many of these ships respectively intentionally injured or destroyed the machinery and motive power of the ships. For these acts the masters and some members of the crews of the respective ships were indicted in the appropriate federal district courts for violation of section 1, Title III of the Act of June 15, 1917, 40 Stat. 217, 221, 18 U.S.C.A. § 502. Upon the trial of the respective cases the defendants in most of them were convicted; and the judgments in some of the cases have now been affirmed by the Circuit Courts of Appeal of the Fourth and Fifth Circuits. See Bersio v. United States (Pieraccini v. United States), 4 Cir., 124 F.2d 310, for two of the Maryland cases; and Marchese et al. v. United States, 5 Cir., Mar. 9, 1942, 126 F.2d 671. See, also, opinion by Circuit Judge Goodrich overruling the motion for new trial in United States v. Tomicich, D.C.E. D.Pa., 41 F.Supp. 33. In a few of the cases the defendants were either acquitted or motions for a new trial were granted after conviction. See United States v. Saglietto, D.C.E.D.Va., 41 F.Supp. 21; United States v. Martini, D.C.S.D.Ala., 42 F.Supp. 502.

The Italian vessels involved in the Maryland cases, which were lying in the harbor of Baltimore, were the Pietro Campanella and the Euro. On July 19, 1941 the United States filed in this court libels for forfeiture of the vessels under section 3 of Title II of the same Act of June 15, 1917 above referred to, 50 U.S.C.A. § 193. A comparison of section 1, Title III and section 3, Title II of this Act of 1917, can most conveniently be made by reference to 40 Stat. 220 and 221. As has been said, the criminal prosecutions were under Title III, and the present alleged basis for the forfeiture is under section 3 of Title II. The former prohibits and punishes various acts *by any one,* including tampering with the motive power or instrumentalities of navigation of vessels "with intent to injure or endanger the safety of the vessel"; while section 3 of Title II prohibits the injury of certain vessels *by the owner or master in charge thereof,* and also forbids them—*"to permit said vessel to be used as a place of resort for any person conspiring with another or preparing to commit any offense against the United States,* or in violation of the treaties of the United States or of the obligations of the United States under the law of nations, or to defraud the United States, or knowingly to permit such vessels

to be used in violation of the rights and obligations of the United States under the law of nations; and in case such vessels shall be so used, with the knowledge of the owner or master or other person in charge or command thereof, the vessel, together with her tackle, apparel, furniture, and equipment, *shall be subject to seizure and forfeiture* to the United States in the same manner as merchandise is forfeited for violation of the customs revenue laws". (Italics supplied)

In the criminal cases in this district, and apparently also in some other districts, it was the contention of the defendants, among other things, that the destruction of the motive power of the vessels by the master and crew did not come within the reach of Title III of the Act of 1917 for various reasons; and that if there was any statute applicable thereto it was section 3 of Title II. In the present admiralty cases the claimants of the vessels have filed exceptions to the libels on a number of grounds, the basic one now advanced being that section 3 of Title II was not in operative force at the time of the destruction of the machinery of the vessels, because, it is said, section 3 is dependent upon section 1 of Title II which with section 3 became operative only "whenever the President by proclamation or Executive order declares a national emergency to exist by reason of actual or threatened war, insurrection, or invasion, or disturbance or threatened disturbance of the international relations of the United States;" and it is contended that no such proclamation had been issued by the President prior to the Acts above mentioned. It will be noted, however, (54 Stat. Part 2, p. 2643), the President on September 8, 1939 issued a proclamation reading as follows: "Now, therefore, I, Franklin D. Roosevelt, President of the United States of America, do proclaim that a national emergency exists in connection with and to the extent necessary for the proper observance, safeguarding, and enforcing of the neutrality of the United States and the strengthening of our national defense within the limits of peace-time authorizations. Specific directions and authorizations will be given from time to time for carrying out these two purposes." And (54 Stat. p. 2711; 5 Fed. Reg. p. 2419) the President made a further proclamation under date of June 27, 1940 reciting that the continuation of conditions —"now calls for additional measures within the limits of peace-time authorizations", and after referring to section 1 of Title II of the Act of Congress approved June 15, 1917, 40 Stat. 220, 50 U.S.C.A. § 191, it was declared that—

"the continuation of the conditions set forth in my proclamation of September 8, 1939, and the existence of a national emergency by reason of threatened disturbance of the international relations of the United States.

"And, I therefore consent to the exercise, with respect to foreign and domestic vessels, by the Secretary of the Treasury and the Governor of the Panama Canal, of all the powers conferred by the provisions of said Act."

Exceptions to the original libels were sustained on formal rather than the more substantial ground now advanced, the latter not being then definitely presented. The exceptions to the amended libels are in rather general terms but broad enough to include the basic objection above mentioned. These amended libels are rather elaborate, but on analysis the substance may be stated in abridged form. The forfeiture is based on the alleged violation of section 3 of Title II of the Act of 1917 in that the masters of the vessels respectively knowingly permitted them to be used as a place of resort for persons, to wit, the masters, chief engineer and other members of the crew, who were conspiring with each other, and others, to commit offenses against the United States, to wit (1) to violate the provisions of the Act of June 15, 1917, Title II, § 3, 50 U.S.C.A. § 193, and (2) Title III, § 1, of the Act of June 15, 1917, and (3) the Act of April 20, 1918, as amended November 30, 1940, 50 U.S.C.A. §§ 101–106, which makes it unlawful to wilfully injure or destroy or attempt to so injure or destroy any national-defense material, national-defense premises or national-defense utilities as therein defined, with intent to injure, interfere with or obstruct the national defense of the United States. It is further charged that the conspirators wilfully caused or permitted the injury and destruction of the vessels, and that the vessels were used as a place of resort for persons conspiring to (a) commit offenses against the United States and in violation of the treaties of the United States and the obligations of the United States under the law of nations, and (b) to defraud the United States and (c) knowingly permit the vessels to be used in violation of the rights of the United

States under the law of nations. With respect to these latter general purposes or objects of the conspiracy, the exceptions make the point that they are stated too generally and without sufficient particularity to require an answer by the claimants. It is suggested by the Government that the proper admiralty procedure to present this latter point would be interrogatories for further information rather than by exceptions; but I understand the procedural point is not pressed because counsel for the Government state that these general charges may be disregarded as surplusage. It will be noted from section 3 of Title II of the Act of 1917, 50 U.S.C.A. § 193 that it is thereby prohibited to permit the vessel to be used as a place of resort for any person *conspiring with another or preparing* to commit any offense against the United States, etc. The amended libels after charging the unlawful user of the vessels for persons *conspiring* as alleged, also repeat separately the charges with respect to persons *preparing* to commit offenses, etc. It is also alleged in the libels that by the actions of the master and others the United States was defrauded of the opportunity to exercise the right of "angary". See 1 Bouv. Law Dict., Rawle's Third Revision, p. 195.

The substantial question of law arising on the exceptions to the amended libels is whether section 3 of Title II of the Act of 1917 was effectively in force on or shortly before March 29, 1941. Counsel for the claimants now contend that it was not, on the authority of the recent decision in the Fifth Circuit in the case of Marchese v. United States above referred to. Apparently one of the contentions for the defendants in those cases, as well as in the Maryland cases, was that the prosecution, if maintainable at all, should have been based on section 3 of Title II and not on Title III. In overruling this contention the court, in the opinion by Circuit Judge Sibley, said:

"We think Title II and Title III of the Act, 50 U.S.C.A. §§ 191–194 and 18 U.S. C.A. § 502, are independent. As Judge McDuffie points out, they arose as separate bills in the Senate. Section 3 of Title II penalizes the wilful causing or permitting by an owner, master or member of a crew of a vessel, foreign or domestic, of the injury or destruction of the vessel, or permitting its use for named purposes; but the preceding and following sections show that Title II is applicable only after a proclamation of national emergency, and no such proclamation is alleged or had in fact been made in March, 1941. Section 4, 50 U.S.C.A. § 194, declares that the President may employ the land and naval forces to carry out the purpose of the Title, indicating that emergency pervades the whole Title. Therefore the whole of Title II was properly placed in Title 50 of the United States Code Annotated, along with our other war legislation, rather than in Title 18, where ordinary crimes are treated."

It must be conceded that this holding in the Fifth Circuit is eminent authority to support the contention now made, and if it were the only case in point, I should feel it appropriate to follow it here as persuasive but not obligatory authority in this Circuit. The opinion expressed, however, seems to run counter to the view of the same subject matter taken by the Circuit Court of Appeals for the Fourth Circuit (which of course is obligatory here) in the Pieraccini case, 124 F.2d 310, 312, 313, where, on comparison of Title III and Title II the opinion by Circuit Judge Parker says: "Title II, 50 U.S.C.A. §§ 191–194, deals primarily with control over vessels in ports of the United States, and Title III with injuries to vessels engaged in foreign commerce. · *While there is some overlapping of the two sections,* it is perfectly clear that section 1 of Title III, quoted above, applies to any person who shall tamper with the motive power of any 'vessel of foreign registry'." (Italics supplied) The same view was expressed by Circuit Judge Goodrich in United States v. Tomicich, D.C., 41 F.Supp. 35, cited with approval by Judge Parker. Possibly it may be said that there was no direct holding in the Pieraccini case that section 3 of Title II was effective in March 1941, but a reading of the opinion as a whole seems to indicate that the court considered it in force at that time. The phrase in the opinion above italicized—"While there is some overlapping of the two sections"—seems to plainly show that the court considered both sections in force in March 1941. And this understanding is further fortified when reference is made to the appellants' brief in the case, pp. 32 to 39, which submitted the argument to the effect that Title III should be construed by comparison with section 3 of Title II, which was *in pari materia,* and reading the two together, Title III should be regarded as the *general* statute while Title II was more *specific* and as

such, applicable alone to the particular case. In the face of this contention, which at least assumed that Title II was in force, the opinion of the Fourth Circuit that there was some overlapping of the two sections becomes quite significant.

But apart from this interpretation of the opinion in the Pieraccini case, as inconsistent with the opinion in the Marchese case in the Fifth Circuit, I am of the opinion that intrinsically considered section 3 of Title II was in force in March 1941. It is perhaps true that the physical arrangement of the text of Titles II and III as apparently separate subjects matter conveys at first glance the impression that the opening sentence of section 1 of Title II, 40 Stat. 220, reading—"Whenever the President by proclamation or Executive order declares a national emergency to exist"— was a condition precedent to the whole of Title II; but a closer reading of sections 1, 2 and 3 shows, I think, that the condition precedent applied only to sections 1 and 2 and not to section 3. See also, Judge Paul's opinion in United States v. Saglietto, D.C., 41 F.Supp. 22, 32, which on this point was apparently not disapproved in the Pieraccini case. And I am not aware of any principle of statutory construction which by necessary implication limits the effective force of section 3 to a point of time subsequent to the taking effect of sections 1 and 2. The reasons advanced to the contrary are that Title II on codification has been placed in Title 50 of the United States Code Annotated along with other war legislation; and that section 4 of Title III declares that the President may employ the land and naval forces to carry out the purposes of the title, thus indicating that an emergency pervades the whole title. It is also pointed out that Titles II and III were originally proposed as independent Acts. Certainly these reasons are relevant and plausible in themselves, but they do not seem to be controlling when we find that section 3 of Title II does not in any way textually depend upon the condition precedent of a Presidential proclamation of a national emergency. The mere placing of section 3 of Title II in Title 50 with war legislation generally is clearly not controlling. See U.S.C.A., Title 1, §§ 30 and 54 (supplemental notes), and Warner v. Goltra, 293 U.S. 155, 161, 55 S.Ct. 46, 79 L.Ed. 254.

In the Marchese case it is said with respect to section 3 of Title II—"but

the preceding and following sections show that Title II is applicable only after a proclamation of national emergency, and no such proclamation is alleged or had in fact been made in March, 1941." It has been noted that on September 8, 1939 there was a presidential proclamation that "a national emergency exists in connection with and to the extent necessary", etc. And again on June 27, 1940 a further presidential proclamation was made of a continued national emergency which authorized the Secretary of the Treasury to exercise the powers conferred on him by section 1 of Title II of the Act of 1917, Fed.Reg. Vol. 5, No. 127, p. 2419. It is not apparent why the latter proclamation was insufficient to bring into force sections 1 and 2 of Title II. It is now said that the latter proclamation referred only to section 1 of Title II and from this it is argued that it was not intended to bring into force section 3. But the sounder inference is that the proclamation did not refer to section 3 because it was not applicable thereto. It is also said that both proclamations were of only a "limited" emergency. But nevertheless the latter did constitute a proclamation *of an existing emergency* sufficient to gratify the requirements of section 1 of Title II. The power to make the proclamation was not limited to the existence of an actual state of war but also included international conditions which "threatened war, insurrection, or invasion, or disturbance or threatened disturbance of the international relations of the United States". It can hardly now be disputed that such conditions did exist in 1940 when the presidential proclamation was made. Therefore, even if section 3 was dependent upon a prior presidential proclamation the condition was gratified by the proclamations actually made prior to March 1941.

For these reasons I conclude that section 3 of Title II of the Act of 1917 was in force in March 1941 at the time of the alleged occurrence of the grounds for forfeiture set out in the amended libels, and the exceptions thereto on this ground must therefore be overruled. It is unnecessary to specifically discuss the more general and formal objections to the libel set out in the exceptions, all of which are hereby also overruled. Of course no opinion is intended to be expressed on the facts which of course must await developments at the hearing on the merits.