**UNITED STATES v. THE ANTOINETTA,
and twelve other cases.**

Nos. 8524–8527, 8714, 8752–8755, 8788–8791

Circuit Court of Appeals, Third Circuit.
Argued March 30, 1945.
Decided Dec. 13, 1945.

As Amended Dec. 21, 1945.

Rehearing Denied Feb. 13, 1946.

Homer L. Loomis, of New York City, for the vessels, etc.

J. Frank Staley, of Washington, D. C. (Francis M. Shea, Asst. Atty. Gen., Thorn Lord, U. S. Atty., of Newark, N. J., and Gerald A. Gleeson, U. S. Atty., of Philadelphia, Pa., on the brief), for the United States.

C. Edward Rhetts, Dept. of Justice, of Washington, D. C., for Crowley, Alien Property Custodian.

Albert Parker, of Washington, D. C., for James E. Markham, Alien Property Custodian.

Herbert Wechsler, Asst. Atty. Gen., Harry Leroy Jones, Sp. Asst. Atty. Gen., and Joseph Laufer, Richard P. Lott, Clarice Grosshandler, and John Ernest Roe, all of Washington, D. C., on the brief, for Alien Property Custodians.

Before BIGGS, ALBERT LEE STEPHENS, and McLAUGHLIN, Circuit Judges.

BIGGS, Circuit Judge.

These cases involve rights to eight Italian vessels and constitute appeals and cross-appeals from the judgments of two district courts. Following the practice of the District Courts which decided the cases we shall refer to each group of four cases by the name of one of the ships of the group. Nos. 8752–53–54–55 and the cross-appeals at Nos. 8788–89–90–91 will be referred to as the "Aussa." Nos. 8524–25–26–27 will be referred to as the "Antoinetta." All, with the exception of the appeal at No. 8714, involve suits in admiralty brought on behalf of the United States against ships to declare them forfeited to the United States for violation of Section 3 of the Act of June 15, 1917, 50 U.S.C.A. § 193.[1] The appeal at No. 8714 involves a proctor's fee and is considered last in this opinion. All of the ships were in United States ports and within the territorial jurisdiction of district courts of this circuit at the time of the acts complained of. The libels filed on July 14, 1941 as to the Antoinetta and on July 16, 1941 as to the Aussa pleaded acts of sabotage in the language of the statute and the subsequent execution of the libels and seizure of the vessels on or about March 30, 1941 by Collectors of Customs[2] pursuant to the Act of June 15, 1917, 50 U.S.C.A. § 191. The Italian owners filed their claims and sought dismissals of the libels.

By authority of the Act of June 6, 1941, 55 Stat. 242, 50 U.S.C.A.Appendix, § 1271,[3] the President acting through the United States Maritime Commission duly requisitioned the use of the Antoinetta on

[1] "§ 193. Destruction of, injury to, or improper use of vessels. It shall be unlawful for the owner or master or any other person in charge or command of any private vessel, foreign or domestic, or for any member of the crew or other person, within the territorial waters of the United States, willfully to cause or permit the destruction or injury of such vessel or knowingly to permit said vessel to be used as a place or resort for any person conspiring with another or preparing to commit any offense against the United States, or in violation of the treaties of the United States or of the obligations of the United States under the law of nations, or to defraud the United States, or knowingly to permit such vessels to be used in violation of the rights and obligations of the United States under the law of nations; and in case such

vessels shall be so used, with the knowledge of the owner or master or other person in charge or command thereof, the vessel, together with her tackle, apparel, furniture, and equipment, shall be subject to seizure and forfeiture to the United States in the same manner as merchandise is forfeited for violation of the customs revenue laws; and whoever violates this section shall be fined not more than $10,000 or imprisoned not more than two years or both."

[2] See the requirements of the Customs Revenue Laws, 46 Stat. 747 et seq., 19 U.S.C.A. §§ 1581–1624.

[3] "§ 1271. Purchase, requisition, etc. of foreign vessels authorized during national emergency; compensation; claims against vessels. Whereas Congress has power to provide for the common defense and general welfare and to regulate com-

September 29, 1941 and of the Aussa on September 11, 1941. The requisition orders expressly stated that they were "without prejudice to the rights of the United States under any executive seizure of or forfeiture proceedings against said vessel[s] heretofore or hereafter effected or instituted."[4] The respective district courts whose judgments we are now reviewing granted the petitions for requisition and ordered the continued custody of their respective marshals over the vessels, declaring, however, the action taken by requisition was without prejudice to the continued custody of the courts and that jurisdiction was retained at all times.

On July 22, 1942 the Alien Property Custodian acting pursuant to the trading with the enemy act, First War Powers Act June 6, 1941, 55 Stat. 839, 50 U.S.C.A. Appendix, § 616 issued a vesting order,[5] covering all the vessels involved in this litigation. This order unconditionally and without redress or right of compensation except as might be provided otherwise by future legislation divested claimants of all right, title and interest in the vessels and vested these in the Alien Property Custodian. The order also declared that it should not "be construed as impairing such rights as the United States may already have in respect of said vessels, including * * * rights of forfeiture * * *." The Alien Property Custodian thereafter filed petitions in the courts below praying for orders substituting him as the petitioner in place of the claimants. The Custodian prayed also that all pleadings, motions and claims be dismissed as to the claimants but without prejudice to him as Custodian and that right, title and interest, if any, of the claimants be adjudged to be vested in him.

In the case of the Antoinetta the motion of the Alien Property Custodian was granted. The court also refused to stay all proceedings until the end of the war as prayed by the claimants.[6] In the case of the Aussa,[7] however, the court dismissed the case as moot on the ground that the claimants had been divested of and the Custodian had been invested with all right, title and interest in the vessels; that consequently there remained only a contest between the United States as the libellant in the forfeiture proceedings and the United States acting through the Custodian who asserts complete ownership of the vessels.

The claimants raise many issues which were not discussed in the opinions of the lower court. We shall endeavor to answer these questions in the order in which they are stated.

We begin by stating that it is admitted that this court has jurisdiction of the appeals. The jurisdiction of the district courts, however, is disputed. We think that the district courts had jurisdiction for the following reasons. The libels are in the words of the applicable statute and clearly allege that the owner, master

---

merce with foreign nations and whereas for this purpose embargo Acts and non-intercourse Acts have from time to time been passed and whereas the commerce of the United States is at the present time interrupted and the general welfare of its citizens is threatened and an emergency has been declared, for the purposes of national defense, during the existence of the national emergency declared by the President on September 8, 1939, to exist, but not after June 30, 1942, the President is authorized and empowered, through such agency or officer as he shall designate, to purchase, requisition, for any period during such emergency charter or requisition the use of, or take over the title to, or the possession of, for such use or disposition as he shall direct, any foreign merchant vessel which is lying idle in waters within the jurisdiction of the United States, including the Philippine Islands and the Canal Zone, and which is necessary to the national defense: Provided, That

just compensation shall be determined and made to the owner or owners of any such vessel in accordance with the applicable provisions of section 902 of the Merchant Marine Act, 1936, as amended: Provided further, That such compensation hereunder, or advances on account thereof, shall be deposited with the Treasurer of the United States, and the fund so deposited shall be available for the payment of such compensation, and shall be subject to be applied to the payment of the amount of any valid claim by way of mortgage or maritime lien or attachment lien upon such vessel, or of any stipulation therefor in a court of the United States, or of any state, subsisting at the time of such requisition or taking of title or possession; * * *."

4 See Executive Order 8771, dated June 6, 1941, 6 F.R. 2759.

5 See 7 F.R. 5738.

6 49 F.Supp. 148. Cf. The Pietro Campanella, D.C., 47 F.Supp. 374.

7 52 F.Supp. 927.

or other person in charge or command of the vessel wilfully caused or permitted the destruction of the vessel and knowingly permitted the vessel to be used as a place or resort for persons conspiring or preparing to commit offenses against the United States. This sufficiently pleads a cause of forfeiture. The Samuel, 1 Wheat. 9, 4 L.Ed. 23.

Section 3 of the Act of June 15, 1917, 50 U.S.C.A. § 193 establishing the crime of destruction of, injury to, or improper use of foreign or domestic vessels is not dependent for its effectiveness upon a presidential proclamation of national emergency. Sections 1 and 2 of that Act authorize the Secretary of the Treasury upon a presidential proclamation of the existence of a national emergency to make rules and regulations governing foreign and domestic vessels and to prescribe penalties for the violations of such regulations. Section 3, clearly a criminal provision, describes the offense and the penalties and is wholly independent of any other section of the Act. Bersio v. United States, 4 Cir., 124 F.2d 310. But even if a presidential proclamation is to be deemed to be necessary to effectuate the provisions of Section 3, the orders made by the President respectively on September 8, 1939, 54 Stat. 2643, 4 F.R. 3851, declaring a national emergency, and on June 27, 1940, 54 Stat. 2711, 5 F.R. 2419 proclaiming an emergency within the purview of Section 1 of the Act, are sufficient. See United States v. Pietro Campanella, D.C., 44 F.Supp. 348, 350. In the order of June 27, 1940 the President stated in part, "And I therefore consent to the exercise, with respect to foreign and domestic vessels, * * * of all the powers conferred by the provisions of said Act [of June 15, 1917]." It was pursuant to this authority that the vessels involved in these cases, as well as other Italian vessels, were seized and taken into custody.

The claimants assert that there are two defects in the Antoinetta libels: (1) That the libels do not assert that the vessels were seized in navigable waters; and (2) that the libels contain no allegations that the vessels were privately owned. As to the first question the libels on their face show that the vessels were in the Port of Chester, Pennsylvania. The court below was entitled to take judicial notice that the Port of Chester is navigable. That fact is notorious. See Brown v. Piper, 91 U.S. 37, 42, 43, 23 L.Ed. 200. As to the second, the claimant's pleadings do not raise any issue in respect to the quality of ownership. The libels show that the Antoinetta was registered under the laws of the Kingdom of Italy in the name of Guiseppe Bozzo fu Lorenzo. The exceptions to the libels filed by this individual assert only that the libel is indefinite. The libels, as we have stated, are couched in the language of the statute and that is sufficient. All the manifold resources of the pleading of the admiralty were available to the claimant. See Admiralty Rule 27, 28 U.S.C.A. following section 723. The assertion of this issue at this time smacks of frivolity.

It is clear that a cause of action was stated fully and adequately under Section 3 of the Act and that the courts below had jurisdiction of the causes.

The subsequent requisitionings of the vessels, as we have pointed out, expressly were without prejudice to any rights of the parties to the forfeiture proceedings. There is in fact no conflict between the provisions of the Act of June 6, 1941, authorizing requisitioning the use of vessels and the Act of June 15, 1917 prescribing forfeiture for the sabotage of vessels. The Villarperosa, D.C., 43 F. Supp. 140. The requisitioning of the ships with which we are concerned in the cases at bar permitted the vessels to be used for purposes vital to the prosecution of the war but did not take them from the custody of the courts. Ex parte Whitney Steamboat Corporation, 249 U.S. 115, 39 S.Ct. 192, 63 L.Ed. 607; United States v. The San Leonardo, D.C., 51 F.Supp. 107. The Act of June 6, 1941 provides that compensation for the use of requisitioned vessels shall be deposited with the Treasurer of the United States. This fund is, therefore, a substitute res and the courts' jurisdiction and dominion were extended to it. This is a sufficient answer to the claimants' assertion that in rem jurisdiction was lost by the requisitioning of the ships. Moreover, it may be pointed out that the marshals, officers of the courts, themselves selected and appointed masters for the vessels and thereby retained custody. Compare the discussion in and the circumstances of Miller v. United States, 11 Wall. 268, at page 294, 20 L.Ed. 135. See The Denny, 3 Cir., 127 F.2d 404. The fact that the vessels may or may not be outside the territorial jurisdictions of the district courts is totally immaterial.

The claimants contend also that the United States may not affirm and deny claimants' title in the same action. This is a mere play upon words. In requisitioning the ships, the United States merely took over whatever rights the claimants may have had. The order of requisition did not attempt to define the extent of the rights taken or to impart to such rights any validity or inviolability. The libels of forfeiture, on the other hand, punitively abrogated the claimants' rights. There is nothing inconsistent or mutually incompatible in these two separate courses or proceedings.

Once the Custodian is substituted as the claimant in the libel proceedings, it is contended that no justiciable controversy remains. The District Court of the United States for the District of New Jersey,[8] which adjudicated the Aussa controversy, held that under the vesting order of the Custodian "the claimant was divested of, and the petitioner [the Custodian] invested with, all right, title and interest in the said vessel". This is not correct. The claimants were divested of whatever rights they may have had in the vessels and the Custodian was invested with those rights, but the rights of third parties were not affected by the vesting order. The forfeiture suit is a proceeding in rem against the vessel and adjudicates rights as against the world. Gelston v. Hoyt, 3 Wheat. 246, 318, 4 L.Ed. 381. It it apparent that the scope of the vesting order is in no wise comparable with that of the forfeiture proceeding. Although the interests of the Custodian are not antagonistic to the United States as libellant, there is a justiciable case or controversy since third party interests and indeed all interests in the world are determined by the decree.[9]

The claimants agree that the vesting order is not coextensive with the libel but insist that since the vesting of possession in the Custodian would be unnecessary if the libel results in forfeiture, the Custodian must await the outcome of those proceedings. We cannot agree with this view. The rights of the Custodian, although asserted by him without prejudice to the rights of the libellant, are not subordinate to them. The claimants do not assert that if the libels were dismissed the vesting order would fall. The Custodian's rights are unrelated to the forfeiture proceedings. As the District Court of the United States for the Eastern District of Pennsylvania stated correctly in the Antoinetta,[10] the determination and conclusions of the Alien Property Custodian upon which the vesting order is based are not subject to judicial review. Hirabayashi v. United States, 320 U.S. 81, 63 S.Ct. 1375, 87 L.Ed. 1774; Gray v. Powell, 314 U.S. 402, 411, 62 S.Ct. 326, 86 L.Ed. 301. By this seizure the Custodian became invested with whatever rights claimant had. It is, therefore, right and proper that the Custodian be substituted in the libel proceeding for the claimant since the latter has been irrevocably divested of all his interests. Any possible rights which claimant may acquire pursuant to subsequent legislation will be a matter of grace and cannot be considered in the instant controversies.

On the "Brennero", one of the ships in the Aussa case, was a cargo of oil. This was claimed by the Italian Ambassador on behalf of the Italian Navy. The court ordered the oil removed and sold.[11] The proceeds amounting to $151,599.45 were deposited in the registry of the court. Homer L. Loomis, Esquire, counsel for claimants in all these cases, seeks compensation as proctor from this fund. He asserts that there was an oral agreement between himself and the owner that the oil was charged with a lien in his favor to support his claim for compensation for his services in the litigation involving all these ships. The Custodian, however, seized the cargo as well as the ship. The seizure vested title to the oil in the Custodian. If the proctor had a valid lien prior to the seizure, the lien would not be affected by the seizure. On the other hand, if the proctor had only an unsecured claim against the ship owner, he must resort to a suit against the United States as provided in Section 9(a) of the Trading with the Enemy Act, 40 Stat. 411, 50 U.S.C.A.Appendix, § 9(a).

The District Court of New Jersey held that the Custodian by his seizure of

---

[8] See 52 F.Supp. 927 at p. 929.

[9] See Asiatic Petroleum Corporation v. Italia Societa, 3 Cir., 119 F.2d 610 as an example of the claims asserted against these vessels.

[10] See 49 F.Supp. 148, at page 154.

[11] This dispute culminated in the decision rendered in Ex parte Colonna, 314 U.S. 510.

the fund had acquired absolute title thereto and dismissed the proctor's petition for want of jurisdiction. An order effecting this decision was entered and four days later the clerk of the court forwarded a check for the full amount of the price at which the oil was sold to the Custodian. The proctor had not moved for a stay pending an appeal.[12] The proctor asserts that the removal of the fund from the registry of the court was without color of right. This assertion cannot be supported. The removal was pursuant to a lawful court order. The proctor was entitled to assert his claim if he could establish a valid and subsisting lien because of his services to the Brennero. But he did not move for a stay within the period prescribed by law and the funds passed beyond the jurisdiction of the court pursuant to an order which the court had the power to make. The fund is gone and the proctor must seek his fee by a suit against the United States.

The judgments appealed from at Nos. 8524–25–26–27 are affirmed.

The judgments appealed from at Nos. 8752–53–54–55 and 8788–89–90–91 are reversed.

The judgment appealed from at No. 8714 is affirmed.

---

[12] See Rule 73(d) Federal Rules of Civil Procedure, 28 U.S.C.A. following section 723c made applicable to appeals in admiralty by virtue of Rule 15 of this court.