## THE PIETRO CAMPANELLA.
## THE EURO.
### Nos. 2498, 2499.

District Court, D. Maryland.
July 22, 1947.

Bernard J. Flynn, U. S. Atty., of Baltimore, Md., J. Frank Staley, Sp. Asst. to Atty. Gen., Thos. F. McGovern, Admiralty Counsel, of Washington, D. C., for libellant.

James D. Hill, Sp. Asst. to Atty. Gen., for Tom C. Clark, Atty. Gen., successor to Alien Property Custodian.

Homer L. Loomis (of Loomis & Williams), of New York City, and Chas. Ruzika (of Brown & Brune), of Baltimore, Md., for Euro and Campanella.

Thos. G. Young, Jr., and France, Rouzer & Lentz, all of Baltimore, Md., for Socita Navigazione Tito Campanella and Socita Navigazione Ligure Di Armamento, on motion to exclude counsel.

CHESNUT, District Judge.

In March 1941, after Italy had entered the European War but before the United States was at war, the master and crews of the two Italian Steamships, the Euro and the Pietro Campanella, injured or destroyed the motive power of the ships respectively after they had been for some time anchored in the Baltimore Harbor. For these acts the master and crews of the two vessels were convicted in this court under 18 U.S. C.A. § 502, a codification of title 3, § 1 of the Act of Congress of June 15, 1917, 40 Stat. 217, 221. The convictions were affirmed by the Circuit Court of Appeals for the Fourth Circuit in an opinion by Circuit Judge Parker, Bersio v. United States (Pieraccinni v. United States), 124 F.2d 310.

On July 19, 1941 the United States also filed libels against the ships for forfeiture under 50 U.S.C.A. §§ 191–194, and particularly section 193, a codification of title 2 of the same Act of June 15, 1917, 40 Stat. 220, §§ 1–4. The trial on the merits of these libels for forfeiture has only recently been held and, after hearing evidence and arguments of counsel, the question now to be decided is whether the ships were properly liable to be forfeited under the provisions of these last mentioned statutes, and particularly section 193. But in the intervening six years much has happened in the cases.

Exceptions to the libel were filed and sustained on formal grounds with leave to amend, and amended libels were filed on January 21, 1942. Exceptions to the latter were overruled but in view of the whole averments of the amended libels the particular point of construction of section 193 hereinafter referred to was not then specifically considered in the opinion of this court. United States v. The Pietro Campanella (United States v. The Euro), D.C., 44 F.Supp. 348.

On October 6, 1941 the United States filed petitions in the United States Court reciting that on September 11, 1941 the United States Maritime Commission had requisitioned the use (not full ownership) of the vessels under the authority of the Act of Congress of June 6, 1941, 55 Stat. 242, 50 U.S.C.A.Appendix, § 1271. The petition prayed that the marshal of the court be instructed to deliver the ships to the Maritime Commission but without prejudice to any of the rights of the parties libellant to the proceedings, this court retaining its custody and jurisdiction in all respects of the said vessels in each of said proceedings. This petition was resisted by counsel who had appeared in the case on behalf of the claimants of the ships. After hearing, the petition was granted under the conditions set out in the opinion of the court. The Pietro Campanella (The Euro), D.C., 41 F.Supp. 656, 661.

On July 30, 1942 the Alien Property Custodian filed a petition reciting that on July 22, 1942 he had passed a "vesting" order No. 52 (7 Fed.Reg. 5738) which vested in himself all right, title and interest, *if any,*

of the claimants in the said vessels in the interest of and for the benefit of the United States. This vesting order was made under the authority of the "Trading with the Enemy Act" of October 6, 1917, §§ 5(b) and 7(c), as amended, 50 U.S.C.A.Appendix, §§ 5(b), 7(c) and Executive Order 9095 of March 11, 1942, as amended, 50 U.S.C.A. Appendix, § 6 note (7 Fed.Reg.No. 1971). The order further stated that the term "vessels" as used in the order "includes any claim against the United States for compensation for anything heretofore or hereafter done under the Act of June 6, 1941, Public Law 101, 77th Cong. [50 U.S.C.A.Appendix, § 1271], in respect of said vessels". In consequence thereof the petition of the Alien Property Custodian prayed that he should be *substituted* for the prior owners of the ships who were the claimants in the case. The extent and scope of the prayer for substitution and the express purpose thereof was to make the Alien Property Custodian *dominus litis* for all purposes of the cases to the *exclusion* of all further participation therein by the claimants. One effect of the order if granted would have been to permit the Alien Property Custodian, if he so elected, to consent to a decree of forfeiture in favor of the United States. Counsel for the claimants resisted the passage of the order but did not oppose the intervention of the Alien Property Custodian nor deny his right as such to succeed to whatever rights, if any, the claimants *then had* with respect to the ships or the compensation to be thereafter determined payable therefor. No compensation has heretofore been ascertained or paid or deposited by the United States with respect to the requisition of the use of the said ships. It is also now stated by counsel that both the ships were destroyed or sunk as a result of enemy action during the recent war.

The United States being then at war with Italy, counsel for the claimants also prayed that further action with respect to the libels for forfeiture should be suspended during the war. After a hearing on these several petitions the court determined (1) that the Alien Property Custodian might intervene and be entitled to have and receive any right, title or interest which the claimants then were entitled to with respect to the ships or the proceeds of the use of the ships by the United States; (2) but that the Alien Property Custodian was not entitled to be substitued for the claimants to the extent of making him *dominus litis* in the case and thereby ousting the claimants from the right to defend the libels for forfeiture of the ships; and (3) that the prosecution of the libels for forfeiture should be stayed during the continuance of the war. The opinion of the court was filed giving the reasons for those decisions and the consequent orders thereon. The Pietro Campanella (The Euro), D.C., 47 F.Supp. 374. The Alien Property Custodian appealed from the last-mentioned orders but subsequently dismissed the appeal. On October 13, 1943, Leo T. Crowley, then Alien Property Custodian, filed a formal claim as owner of the ships, including the right to receive any compensation for the use of the vessels that may be determined to be payable therefor in accordance with the applicable laws on July 22, 1942 (the date of the original vesting order).

On February 24, 1947 the Attorney General of the United States filed a petition to be substituted in the place of the Alien Property Custodian in consequence of Executive Order No. 9788, October 14, 1946, 50 U.S.C.A.Appendix, § 6 note (11 Fed.Reg. 11981) whereby the office of Alien Property Custodian was terminated and all the powers and duties thereof and all property and interest vested in or transferred and seized by the Alien Property Custodian and all proceeds thereof were delegated to and vested in the Attorney General. The petition also referred to various other forfeiture proceedings by libels against numerous other Italian ships lying in other ports of the United States, the motive power of which was said to have been similarly injured or destroyed by the respective masters and crews, with recitals of subsequent forfeiture proceedings against such other ships and the vesting orders of the Alien Property Custodian similar to that in the instant cases in this court. Particular reference was made to the opinion of the Third Circuit Court of Appeals in the case of United States v. The Antoinetta, 3 Cir., 153 F.2d 138, in support of the contention of the Attorney General that the Alien Property

Custodian should have been substituted fully as *dominus litis* in the cases in this court.

The petition prayed that the Attorney General should be substituted as successor to the Alien Property Custodian, that the order of this court dated October 28, 1942, above referred to (see opinion dated October 13, 1942, 47 F.Supp. 374), be withdrawn and that petitioner be substituted in all respects as a party in place of the claimants of the ships and that the latter be adjudged to be without any rights in the vessels and that all right, title and interest, if any, that the claimant may have had therein prior to the issuance of vesting order No. 52 be vested in the petitioner; and that the claimant be barred and excluded from further participation in these cases, and that the appearance of Homer L. Loomis and other counsel as proctors for the claimants be stricken from the files and records of the cases and that such proctors be barred and excluded from further participation therein as proctors for the said claimants; and that the petitioners be granted leave to amend, supplement or withdraw any of the claims, pleadings or motions herein filed on behalf of the claimant and be granted leave to file such other claims, pleadings, motions or exceptions as petitioner may desire. The court had not been requested to hold a hearing specifically on this last-mentioned petition, but at the recent trial on the merits Mr. James D. Hill, designated by the Attorney General to represent him in the matter, appeared and participated in the argument of the cases, and has filed an extensive brief in support of his position.

It is also to be noted that during the recent trial other Baltimore counsel filed a written appearance in the case on behalf of the S. S. Pietro Campanella and the Euro and their owners, claimants, and during the hearing certain Italian citizens, presently resident in Washington, D. C.,

personally appeared, asserted that they were authorized representatives or agents for the two Italian corporations as owners respectively of the Campanella and Euro, and verbally stated that it was not the wish or desire of the said respective corporations as owners to further contest the claims of the United States. It appeared on further examination of these parties that their major interests were in other matters said to be in negotiation between the United States and the Italian government. These witnesses also took the position that the original owners and claimants of the Italian ships had not employed Mr. Loomis and his associates to act for them originally in the matter of the ships. To this Mr. Loomis replied that for years he had conducted the litigation on behalf of the ships, that he was originally employed by the Italian Embassy of the United States before the United States became involved in war with Italy, and also by a general Italian Steamship Agency representing the ships. It also appears from this and numerous other similar cases in other district courts of the United States that for a period of years past Mr. Loomis has been defending these forfeiture suits against the ships. It is also to be noted that on October 1, 1942, Mr. Loomis and other counsel filed a petition for the allowance of counsel fees in the cases. These counsel contend that they have a valid lien for compensation which should be paid from the proceeds of the requisitioning of the ships in the event the forfeiture is not decreed. No hearing or determination of this latter question has yet been made.

As previously indicated, the question now to be decided is whether the ships were liable to forfeiture under title 2, §§ 1 to 4, of the Act of June 15, 1917, 40 Stat. 220, now codified in 50 U.S.C.A. §§ 191 to 194. The whole of these sections is copied in the margin.[1]

---

[1] "Section 1. Whenever the President by proclamation or Executive order declares a national emergency to exist by reason of actual or threatened war, insurrection, or invasion, or disturbance or threatened disturbance of the international relations of the United States, the Secretary of the Treasury may make, subject to the approval of the President, rules and regulations governing the anchorage and movement of any vessel, foreign or domestic, in the territorial waters of the United States, may inspect such vessel at any time, place guards thereon, and, if necessary in his opinion in order to secure such vessels from

The whole Act of June 15, 1917, 40 Stat. 217, 231, embraces 13 separate titles. It is a well-known matter of history that the Act was passed shortly after the United States became involved in the First World War on April 6, 1917; and various provisions of the whole Act doubtless reflect the knowledge of Congress of various activities with regard to sabotage of ships by or on behalf of enemy aliens, or those about to become enemies shortly prior to April 1917, including the sabotage of many German ships then in ports of the United States. The title of the Act was "An Act to punish acts of interference with the foreign relations, the neutrality, and the foreign commerce of the United States, to punish espionage, and better to enforce the criminal laws of the United States, and for other purposes."

Title 1 deals with espionage; title 2 with vessels in ports of the United States; title 3 with injury to vessels engaged in foreign commerce; title 4 with interference with foreign commerce by violent means; title 5 with enforcement of neutrality; title 6 with seizure of arms and other articles intended for export; title 7, certain exports at time of war unlawful; title 8, disturbance of foreign relations; title 9, passports; title 10, counterfeiting government seal; title 11, search warrants; title 12, use of mails, and title 13, general provisions.

Coming to title 2, section 1 provides that whenever the President declares a national emergency to exist by reason of actual or threatened war, insurrection or invasion, or disturbance or threatened disturbance of international relations of the United States, the Secretary of the Treasury may make, subject to the approval of the President, rules and regulations governing the anchorage and movement of vessels in territorial waters of the United States, etc. Section

damage or injury, or to prevent damage or injury to any harbor or waters of the United States, or to secure the observance of the rights and obligations of the United States, may take, by and with the consent of the President, for such purposes, full possession and control of such vessel and remove therefrom the officers and crew thereof and all other persons not specially authorized by him to go or remain on board thereof.

"Within the territory and waters of the Canal Zone the Governor of the Panama Canal, with the approval of the President, shall exercise all the powers conferred by this section on the Secretary of the Treasury."

"Sec. 2. If any owner, agent, master, officer, or person in charge, or any member of the crew of any such vessel fails to comply with any regulation or rule issued or order given by the Secretary of the Treasury or the Governor of the Panama Canal under the provisions of this title, or obstructs or interferes with the exercise of any power conferred by this title, the vessel, together with her tackle, apparel, furniture, and equipment, shall be subject to seizure and forfeiture to the United States in the same manner as merchandise is forfeited for violation of the customs revenue laws; and the person guilty of such failure, obstruction, or interference shall be fined not more than $10,000, or imprisoned not more than two years, or both."

"Sec. 3. It shall be unlawful for the owner or master or any other person in charge or command of any private vessel, foreign or domestic, or for any member of the crew or other person, within the territorial waters of the United States, willfully to cause or permit the destruction or injury of such vessel or knowingly to permit said vessel to be used as a place of resort for any person conspiring with another or preparing to commit any offense against the United States, or in violation of the treaties of the United States or of the obligations of the United States under the law of nations, or to defraud the United States, or knowingly to permit such vessels to be used in violation of the rights and obligations of the United States under the law of nations; and in case such vessel shall be so used, with the knowledge of the owner or master or other person in charge or command thereof, the vessel, together with her tackle, apparel, furniture, and equipment, shall be subject to seizure and forfeiture to the United States in the same manner as merchandise is forfeited for violation of the customs revenue laws; and whoever violates this section shall be fined not more than $10,000 or imprisoned not more than two years, or both."

"Sec. 4. The President may employ such part of the land or naval forces of the United States as he may deem necessary to carry out the purpose of this title."

2 provides that if those in charge of such vessels fail to comply with the regulations of the Secretary the vessels "shall be subject to seizure and forfeiture to the United States". Section 3 makes it unlawful for the owner or master of vessels "willfully to cause or permit the destruction or injury of such vessel" or knowingly to permit the vessel to be used as a place of resort for any person conspiring to commit any offense against the United States, etc. And section 4 provides that the President may employ land or naval forces to carry out the purposes of the title.

With respect to sections 1 and 2 of title 2 it may be said at once that the forfeiture of the ships is not authorized thereby because in March 1941 the Secretary of the Treasury had not made any rules or regulations governing the anchorage and movement of vessels and therefore there is no basis for the contention that the forfeiture was authorized by section 2 for failure to comply with regulations which were not in existence. It necessarily results, therefore, that if the forfeiture is authorized in this case it must be only by virtue of section 3 of title 2 which, for convenience in consideration and in discussion, may be paragraphed as follows:

"Sec. 3. [1] It shall be unlawful for the owner or master or any other person in charge or command of any private vessel, foreign or domestic, or for any member of the crew or other person, within the territorial waters of the United States, willfully to cause or permit the destruction or injury of such vessel

"[2] or knowingly to permit said vessel *to be used as a place of resort* for any person conspiring with another or preparing to commit any offense against the United States, or in violation of the treaties of the United States or of the obligations of the United States under the law of nations, or to defraud the United States, or knowingly to permit such vessels to be *used* in violation of the rights and obligations of the United States under the law of nations;

"[3] and in case such vessel shall be so *used*, with the knowledge of the owner or master or other person in charge or command thereof, the vessel, together with her tackle, apparel, furniture, and equipment, shall be subject to *seizure and forfeiture* to the United States in the same manner as merchandise is forfeited for violation of the customs revenue laws;

"[4] and whoever violates this section shall be fined not more than $10,000, or imprisoned not more than two years, or both." (Italics supplied.)

The principal, and I think controlling, question in the case is whether the provision for forfeiture in the third paragraph is applicable to the violations contained in the second paragraph only, or also to that contained in the first paragraph. The problem is, of course, one of statutory construction and the answer to it is what was the intention of Congress in passing the statute. But before discussing this crucial issue it is appropriate to consider and dispose of certain other contentions of the respective parties. Some of these depend, in part at least, upon the facts found by the court from the evidence in the case, of which the following is a brief statement.

In general I find from the evidence in this forfeiture case the same facts which were disclosed in the criminal prosecutions of the masters and crews of the Campanella and the Euro. These were briefly summarized by Judge Parker in his opinion for the Fourth Circuit in Bersio v. United States, 124 F.2d 310, 313: "The evidence against them establishes that, on orders from the Naval Attache of the Italian Embassy at Washington, they proceeded to destroy the motive power of the vessels by inflicting damage of various sorts upon their engines, motors, pumps and other machinery. Their defense was that this was done not with any intent to impair the safety of the vessels, but with the consent of their owners to immobilize them and to prevent their use by an enemy nation."

In more detail, what happened was that on or about February 22, 1941, while both vessels were at anchorage in the Baltimore Harbor south of Fort McHenry, Admiral Alberto Lais, Naval Attache of the Royal Italian Embassy, by appointment met the masters of the two ships in Baltimore City and instructed them that they would in the near future receive a certain prearranged

communication in code which, when received, would be an order to them to damage the engines, boilers and deck machinery of the ships without injuring the hulls. Later the same day Admiral Lais went on board the two ships with their respective masters and met and had some general but not special talk with the crews. It is somewhat uncertain on the evidence whether the orders from the Naval Attache to the masters were given or repeated on board the ships while he was there; but I consider this uncertainty immaterial in the case. The prearranged message was received by mail by the respective masters on March 19, 1941. The masters then, through the chief engineers, gave the order to the crews to damage the engines, machines and boilers and make them unfit for use. These orders were promptly carried out by the crews and the motive power of the ships was thereby destroyed. Thereafter in due course and before filing the libels for forfeiture, a seizure of the ships was made by the United States Authorities as to which I find no defect in procedure. Attention is also called to the provisions of 19 U.S.C.A. § 1615, to the effect that where a seizure has been made with probable cause the burden of proving a nonviolation in a forfeiture case is upon the claimant and not upon the United States. But again I regard this as unimportant in this case where the facts are fully established and where the critical question is a matter of law rather than of fact.

■ In support of the forfeiture the Government contends that the evidence shows a violation of paragraph 2 of § 193 (as above set out) as well as a violation of paragraph 1. That is to say, it is contended the masters of the vessels knowingly permitted them *to be used as a place of resort* for persons conspiring or preparing to commit an offense against the United States. But I do not find this contention sustained on the evidence in the case. The argument is that by permitting the Naval Attache to come on the ships and then commanding and permitting the crew to visit various parts of the ships for the purpose of destroying the motive power, the masters thus permitted the vessels to be used as a place of resort for conspiracy and preparation to commit an offense against the United States. In my view this is a strained and unnatural and unwarranted view of the facts. The crews were, of course, at home upon their ships. They were not a place of "resort" for the crews. The ordinary meaning by the context and the conditions out of which the Act grew, seems to me clearly to refer to permission for outsiders, that is other than the crew, to frequent the ships for improper purposes. I think it would be a strained and unnatural construction of the words to apply them to the crew even though they were performing unlawful acts upon the ships. If persons commit crimes in their own homes it would not be in accordance with the ordinary acceptation of the English language to say that those persons were using their homes as a place of resort for the commission of crime.

■ A place of resort is not the same as a place of abode. One's residence or home cannot fairly be classed as a place of resort by the owner or resident. Commonwealth v. Stahl, 7 Allen, Mass., 304; State v. Dodge, 78 Me. 439, 6 A. 875; State v. On Gee How, 15 Nev. 184; Taylor v. Monk, [1914] 2 K.B. 817. Moreover the idea of "a place of resort" connotes frequent or repetitive visits to the place. United States ex rel. Dobra v. Lindsey, 5 Cir., 51 F.2d 141, 142; Lindsey v. Dobra, 62 F.2d 116, certiorari denied 288 U.S. 606, 53 S.Ct. 397, 77 L.Ed. 981; Commonwealth v. Lambert, 12 Allen, Mass., 177; State v. Seba, Mo.App., 200 S.W. 300; State v. Fogg, 107 Me. 177, 77 A. 714; State v. Owens, 9 Kan.App. 595, 58 P. 240; Lynn v. State, 27 Tex.App. 590, 11 S.W. 640; Commonwealth v. Charlie Joe, 193 Mass. 383, 79 N.E. 737. Therefore on the evidence in this case I do not find that the ships were used as a place of resort for any of the purposes mentioned in the Act. And I find no evidence sufficient to show that the masters of the ships "knowingly permitted them to be used in violation of the rights and obligations of the United States under the law of nations."

■ Among other defenses Mr. Loomis contends that section 193 was not operative on March 19, 1941 when the sabotage was committed. I held to the contrary in the

opinion in 44 F.Supp. 348, for the reasons therein stated. See also Bersio v. United States, 4 Cir., 124 F.2d 310, 313, and United States v. The Antoinetta, 3 Cir., 153 F.2d 138, certiorari denied 328 U.S. 863, 66 S.Ct. 1368, 90 L.Ed. 1633. Cf. Marchese v. United States, 5 Cir., 126 F.2d 671, 673.

■ Another contention by Mr. Loomis is that the action of the United States Maritime Commission in requisitioning the use of the ships and thereby taking them out of the actual physical custody of the District Court constituted in legal effect an abandonment of the Government's claims for forfeiture of the ships. But this court held to the contrary in the opinion in 41 F.Supp. 656.

■ I return now to the controlling question in the case which, as above stated, is whether the forfeiture provision in paragraph 3 of section 193 applies to the acts mentioned in and forbidden by paragraph 1. After extended consideration of this question of statutory construction I have concluded that the answer is—No. The ultimate object in federal statutory construction is to ascertain the intent of Congress, and the principal and primary aid in doing so is to consider the nature and usual meaning of the words of the statute. Where these are plain and unambiguous they should be given their normal effect. If ambiguous or uncertain in their import, help in their interpretation may properly be found in the legislative history of the Act. And in any case the meaning of the words used should be considered in the light of the national conditions existing at the time and from which the statute presumably emerged.

The forfeiture provision in paragraph 3 of section 193 reads: "and in case such vessel shall be *so used,* with the knowledge of the owner or master or other person in charge or command thereof, the vessel, together with her tackle, etc., shall be subject to seizure and forfeiture to the United States in the same manner as merchandise is forfeited for violation of the customs revenue laws." (Italics supplied.)

Obviously the important words here are the two words "so used". Therefore to justify the forfeiture it is necessary to find that the vessels were "used" in a manner prohibited by the section. When the statute is carefully read it is noted that the prohibited uses are those described in paragraph 2. The word "used" is repeated three times in the paragraph. The uses prohibited are knowingly permitting the vessel to be used as a place of resort, etc., and permitting the vessels to be used in violation of international law. A mere reading of the section, without any preconceived thought or thesis to be maintained, seems to me to lead naturally and at least grammatically, to the conclusion that the prohibited uses referred to in the phrase "so used" are those specifically previously mentioned as prohibited uses. We find no similar words "to use" in the first paragraph of section 193 which prohibits the destruction or injury of the vessel. The nature of the latter prohibited actions can be properly described not as "use" of the vessels but as "abuse" of them.

Again, if Congress had intended the forfeiture provision in paragraph 3 to have been applicable to the injury of vessels described in paragraph 1, the natural language to have been used would have been to make the phrase read "and if any such vessels shall be so *injured* or used". Counsel for the United States in support of the forfeiture contention argues that the phrase "so used" can be properly interpreted as "so treated" or "so employed or treated". But it is obvious that these words were not used in the statute and indeed they would have been inapt in application to the injury or destruction of vessels which constitute an abuse rather than a use. And it may be observed also that the word "treat" would be in itself inapt because it is attempted to be used here in the sense of mistreated rather than treated. Again it is to be noted that the very nature of the prohibition against injuring and destroying the vessels is wholly different in conception from that of using them as a place of resort. The two ideas are quite disparate. The differences are not merely grammatical but involve quite different conceptions.

Both parties to the controversy rely upon the legislative history of the Act in support of their respective contentions, and counsel have been at pains to submit the whole of this history in considerable detail.

I have carefully examined it. I do not find any express or clear and unambiguous expression either in the Committee Reports or in debates to aid the construction. There is, however, in one point in the history an implication which is of considerable weight in support of the view herein adopted.

The principal points in the legislative history are these. The origin of section 193 is to be found in Senate Bill 6795 of the 64th Congress (which expired March 4, 1917), which contained as section 2 the provisions of section 193 but *without the first paragraph* thereof as the statute was finally passed in the succeeding Congress. This particular Bill (S. 6795) was introduced into the Senate on August 5, 1916, apparently in consequence of a recommendation made by Mr. Charles Warren, then Assistant to the Attorney General, to deal clearly and definitely with various subjects matter affecting the interests of the United States with respect to foreign vessels in our ports and not clearly then covered in existing law. Of course the general international conditions then existing with respect to the European War, which had then been in progress for more than two years, were well known. But it is to be noted that the contents of the Bill as then formulated did not contain the provisions of the present paragraph 1 making it unlawful to injure or destroy foreign ships in our ports. It was not until six months later, about February 1, 1917, that many of the German ships in our ports were sabotaged by their crews. And it was after this new development that the Senate Bill on the subject was on February 8, 1917, amended to include what subsequently became title 2 of the Act of June 15, 1917 which, in section 3, included the first paragraph of section 193 as above set out. This amended Senate Bill, however, was not passed by the 64th Congress. In the succeeding 65th Congress on April 2, and 3, 1917, new Bills were introduced relating to the same general subject matter in both Houses. They became S.2 and H.291. S.2 was in substance a rewriting of S.6795 of the prior Congress. H.291 also included substantially the provisions of what ultimately became section 193 but

with the important difference that paragraph 3 of section 193 in the House version (in contrast to the Senate version) read "and in case of *violation of this section* the vessel, together with her tackle, etc., shall be subject to seizure and forfeiture to the United States in the same manner as merchandise is forfeited for violation of the customs revenue law."

It is clear enough that if the House Bill had been enacted the vessels in this case would have been subject to forfeiture. But the House Bill was not enacted. When it was sent to the Senate and referred to the Judiciary Committee it was reported out with an amendment striking out all the text of the House Bill and substituting the text of S.2, which contained the provision for forfeiture as finally enacted in the third paragraph of section 193. After the Senate passed its version of the new Act the respective House and Senate Bills went to conference and finally the House conferees receded from their version and it was the Senate version that was ultimately passed. Representative Webb, one of the House conferees, reported to the House that they found no material difference between the House and Senate versions of the Bill. There was, however, no special reference to the particular matter now under discussion and it is to be noted that the Senate evidently regarded the differences as substantial because it declined to accept the House version.

It is clear enough as a matter of history that the reason for adding the first paragraph of section 193 to the original Warren draft, was due to the fact that some of the German ships in our ports in February 1917 were sabotaged. See Wierse v. United States, 4 Cir., 252 F. 435, 441. But while the court may well take judicial notice of this historical fact that does not solve the problem of proper construction which is here involved. The question is not whether Congress could properly and fairly have provided for forfeiture of the ships for the actions of sabotage, but whether, in the wording of the statute, it did so do. The first paragraph of section 193 was not made ineffective but on the contrary by paragraph 4 was made a criminal offense

and subject to possibly severe punishment. The question here is whether in addition to this penalty, section 193 also provides for the forfeiture of the ship for the same action which was made personally penal. That is, were the ships so injured by the unlawful acts of their crews to be forfeited to the United States as well as the masters and crews personally penalized. It is a familiar rule of construction that a forfeiture is not lightly to be inferred. And, therefore, a provision for forfeiture should be clearly expressed. Numerous instances where such provisions have been clearly expressed are to be found in various forfeiture acts including a number in this whole Act of June 15, 1917. For instance, see title 2, section 2 (now 50 U.S.C.A. § 192), and title 5, section 6, 18 U.S.C.A. § 36, and title 7, section 3, of the Act of June 15, 1917, 40 Stat. 225.

Mr. Loomis also suggests a possible particular reason why the Senate refused to accept the broader provision of the House Bill with regard to forfeiture. He contends that forfeiture statutes with respect to vessels or vehicles are usually, if not invariably, predicated upon their unlawful use and not upon injury to or abuse of the things themselves. Paragraph 1 of section 193 forbids the destruction or injury of a vessel. Obviously if the vessel were destroyed it would be seemingly futile to provide for its forfeiture and pro tanto with respect to injury short of destruction. Where the vessel or vehicle is intentionally used as an instrument in violating laws, there is reason in the statutes which provide for their forfeiture for such unlawful use. But a similar reason does not exist for activities not related to the use of the vessel or vehicle as an instrumentality in violating the law but to an injury or abuse of the things themselves. This view perhaps has some logical force particularly with respect to a vessel which in admiralty law is frequently personified and subject to libel in rem for wrongful acts committed by the ship.

For these reasons I conclude that by the proper construction of section 193 a forfeiture is not provided for the injury to or destruction of the ships by their masters and crews.[2]

There remains the further question as to whether the Attorney General as successor to the Alien Property Custodian is entitled to the fund hereafter determined to be due as compensation for the use and subsequent loss of the ships. The Attorney General claims the absolute right to the whole of this fund. This is now sharply disputed by Mr. Loomis, who with his associates, assert a personal right to a lien upon the

---

[2] My attention has been called by counsel to the recent findings of fact and conclusions of law by Judge Kennerly of the Southern District of Texas in the case of The Mongioia, 73 F.Supp. 17. The findings made were (1) that the master and crew willfully caused or permitted serious injury to the vessel and tampered with the motive power in an attempt to injure and endanger its safety; (2) also that the master and others knowingly permitted the vessel to be used as a place of resort for persons conspiring or preparing with each other and with others to commit offenses against the United States in violation of the laws and treaties of the United States; (3) that all was done in an attempt and effort to interfere with the national defense of the United States. The conclusions of law were that under the decision of United States v. The Antoinetta, 3 Cir., 153 F.2d 138, (1) the Alien Property Custodian became vested of all the rights of the former claimant and the latter had no standing to bring forward such claims and defenses to raise such questions; further that the claims and defenses were not meritorious; (2) that under the authority of the Antoinetta the Alien Property Custodian was vested with whatever rights the claimant had to such vessel and is entitled to be fully substituted in the proceeding for such claimant, and (3) that judgment should be entered forfeiting the vessel to the United States as prayed for, and subrogating the Alien Property Custodian to such rights as he may have herein. These findings and claims were apparently not accompanied by an opinion and I, therefore, do not know the reasoning on which the findings and conclusions were based otherwise than by reference to United States v. The Antoinetta. As will appear from my opinion in the above case, the vessels were subject to forfeiture if the evidence in this case had justified the finding that they had been used as a place of resort for the purposes stated in the statute.

fund for professional services, their notices and claims for which as above stated, were filed in this case on October 1, 1942. Mr. Loomis also now contends that by virtue of the requisitioning proceedings the United States acting through the former Alien Property Custodian, was not authorized to secure title by capture of the fund under the Trading with the Enemy Act. And in support of his contention he has submitted a lengthy and very elaborate brief based on principles of constitutional and international law.

Very shortly summarized this is the argument. The purpose of the Trading with the Enemy Act was to limit the activities of citizens of the United States and not the United States Government itself; that when the government requisitioned the ships under the applicable statute providing for compensation, and at a time before this country was at war with Italy, the United States made a valid bargain and agreement with the owners of the ships that they would be compensated for the use of the ships or for their value if lost, and that both by the principles of the United States Constitution and the widely accepted principles of international law this promise of conpensation made by the United States with persons then friends and not enemies, constituted valid obligations of the United States which cannot be repudiated under the 14th Amendment, § 4, which declares "Validity of public debt of the United States * * * shall not be questioned", and generally accepted principles of international law to the effect that even as a result of war the debts of a government to private persons although enemies, are not to be confiscated. See Perry v. United States, 294 U.S. 330, 55 S.Ct. 432, 79 L.Ed. 912, 95 A.L.R. 1335. It is also argued that as the purpose of the Trading with the Enemy Act was to curb commercial activities of citizens, it should not be and properly cannot be construed to limit the activities of the United States itself; and therefore even after the war with Italy, the continued use of the ships by the United States under the provisions of the Requisitioning Act constituted transactions and dealings by the Government itself with the enemy not forbidden by the Trading with the Enemy Act.

Without disputing the principles of constitutional and international law relied upon, I consider the argument inapplicable to the instant case. The original petition of the Alien Property Custodian was filed in this case on July 30, 1942. It was opposed by counsel for the claimants and after hearing, the respective rights of the claimants and of the Alien Property Custodian were reviewed and determined by this court in the opinion reported in 47 F.Supp. 374. At that time it was my understanding as stated in the opinion (47 F.Supp. at page 377) that counsel for the claimants did not dispute that the vesting order of the Alien Property Custodian of July 22, 1942, had the legal effect of transferring conpletely to the Custodian for the benefit of the United States the principal interests of the claimants in the vessels *as they then existed,* with the exception, however, of the right of counsel for the plaintiffs to be compensated for their services to their clients out of the fund realized from the use or disposition of the vessels. The opposition then made, as I understood it, to the claim of the Alien Property Custodian only went to the extent of denying his right to be wholly substituted as *dominus litis* for the claimants as owners of the ships. Mr Loomis' present contention, however, goes much further than this and now, as above indicated, denies entirely any right, title or interest of the Alien Property Custodian in and to the fund by virtue of the vesting order. I understand that the same broad argument was submitted to the Third Circuit Court of Appeals by Mr. Loomis and rejected by the court in the case of United States v. The Antoinetta, 3 Cir., 153 F.2d 138. And the same argument in equal or more elaborate form was made in the brief filed with the Supreme Court of the United States on the application for certiorari in that case, which was denied. 328 U.S. 863, 66 S.Ct. 1368, 90 L. Ed. 1633. As the present opinion is already of great length, I think it sufficient to say, in answer to the contention as now made, that the principles of constitutional and international law advanced are not applicable to this case. The argument overlooks the fact that, as pointed out by Circuit Judge Biggs in The Antoinetta, the nature of the

proceeding was an admiralty suit in rem against the ships and that its original nature has not been changed in legal principle by the requisition of the ships as both the petitions of the Maritime Commission for authority to take the ships and the orders of court permitting the ships to be taken were without prejudice to the legal continuity of the original forfeiture proceedings. In legal effect, therefore, when the Alien Property Custodian first filed his petition in the case, the court still had constructive possession of the ships and if the forfeiture was not authorized the Alien Property Custodian under the Trading with the Enemy Act had the right to take over the ships themselves if they had actually been in possession of the court; and as they were not, he had the same right with respect to the fund which, under the order of court, was to be substituted for the ships themselves. In this proper view of the case the vesting order by the Alien Property Custodian did not constitute any breach of faith or repudiation by the Government of its promise to individuals, whether friends or enemies.

In the opinion of this court, 47 F.Supp. 374, it was held that the Alien Property Custodian was entitled to intervene in the case and to be substituted to the right, title and interest existing at the time of the vesting order in the claimants, subject only to the still undecided claim of counsel for a lien upon the ships for professional compensation or on the funds therein substituted therefor. The only limitation put by the opinion on the rights of the Alien Property Custodian as then asserted was that he was not entitled to be treated as *dominus litis* in the case with respect to the then still open question of forfeiture of the ships. It is now argued by the Attorney General as successor to the Alien Property Custodian that the limitation was held incorrect in The Antoinetta case, supra, On a careful reading, the opinion in that case does not appear to me to have considered that precise point. But however that may be, the propriety of the limitation is now moot because the forfeiture question has now been litigated by adverse interests, and it has been decided that the ships were not subject to forfeiture.

I see no reason to change the conclusion expressed in the former opinion of this court upon the subject of the rights of the Alien Property Custodian. He succeeds to the rights in and to the fund which the claimants had at the time of the vesting order of July 22, 1942, subject, however, to the still undecided question as to whether Mr. Loomis and his associates have a lien upon the fund for professional services. On this latter question there has yet been no hearing in this case. And presumably it can well be deferred until after the amount of the fund has been determined. It may be added that in view of the present position of the former Italian shipowners as expressed by their representatives at the recent hearing, that they do not wish to further oppose the claims of the United States, it would seem that the only remaining actual controversy in this case is the one just stated, that is, whether the proctors have a lien on the fund for their prior services.

An appropriate decree should be promptly submitted by counsel.