**THE LEME.**

Civ. No. 783.

District Court, D. Oregon.

Jan. 12, 1948.

Henry L. Hess, U. S. Atty., and Victor E. Harr and J. Mason Dillard, Asst. U. S. Attys., all of Portland, Or., for libelant.

Homer L. Loomis and Loomis & Williams, all of New York City, and Edwin D. Hicks, of Portland, Or., for claimant.

JAMES ALGER FEE, District Judge.

A libel for forfeiture of the motorship Leme was filed by the United States July 14, 1941. The purported owner of the ship was "Italia" a Societa Anonima di Navigazione. The United States produced proof at the trial where counsel for claimants appeared and vigorously contested the forfeiture upon May 16 to 22, 1946. Forfeiture was later directed.

This drama of the Second World War is highly colorful and will be developed in outline from the files in order to plot the background against which the action takes place. In June, 1940 two libels were filed in personam and the vessel Leme was attached in each; the first seizure in rem was by Cia Bananera Nacional upon libel based upon a contract of affreightment and the second by the Asiatic Petroleum Corporation for supplies furnished various ships. The Leme was attached by the United States Marshal who kept a nominal watch aboard, although the Captain, Giovanni Polonio, the other officers and crew maintained their living quarters aboard the ship. On or about March 28, 1941 the engines, machinery, instruments of navigation and other equipment and furniture of The Leme were seriously damaged by the crew under the direction of the officers, but no harm was done to the hull. Thereupon the officers of the United States Coast Guard, under orders of the Secretary of the Treasury, removed the officers and crew of The Leme in custody and purported to take possession of the vessel March 30, 1941, but the United States Marshal kept guards thereon as before. Thereupon the Captain, officers and crew of The Leme were indicted and in due course tried and convicted for the damaging of the vessel. This conviction was confirmed on appeal. United States v. Polonio, 77

F.Supp. 768, Polonio v. United States, 9 Cir., 131 F.2d 679.

On July 11, 1941 the Collector of Customs posted on board The Leme notices of seizure as a preliminary to the filing of the libel of condemnation as noted above. Upon petition of the United States Maritime Commission, upon September 11, 1941 possession of the vessel was delivered to this agency under appropriate order retaining custody in the court. This order was in fact violated by the Maritime Commission and The Leme was promptly sold or lend-leased to the British Government without any authority of this court. The vessel has not been returned thereto according to stipulations of this order. However, the original libels under which The Leme was primarily seized have been dismissed, one for want of prosecution and the other on stipulation. Upon the signing of this order of release to the Maritime Commission the United States Marshal withdrew the guards and turned the vessel over to that agency.

Upon April 20, 1942 the United States filed an amended libel to which answer was filed by claimant. Petition for fees for counsel for claimant were denied. The petition of Alien Property Custodian to be substituted as dominus litis was denied, although he was permitted to join as a party. Finally, the Attorney General moved to be substituted for the Alien Property Custodian, which was denied upon the ground that the Attorney General, as counsel for the United States, could not properly prosecute an action in its name where he as claimant was one of the parties.

The case which the court was called upon to dispose came perilously near mootness—a proceeding in rem against a ship which the United States had removed from the possession of its own court on the condition of return, and of which possibility of return was immediately and irrevocably destroyed. The proceeding was in rem, without a res, pursued in time of war, where the claimant, if it was a non-resident enemy corporation or if it were the Imperial Italian Government, had no standing to urge a claim, and the United States in various guises and disguises as Maritime Commission, Secretary of the Treasury, Commandant of the Coast Guard, Alien Property Custodian and Attorney General, was the only possible claimant. Such an outré drama would be intelligible only if the locale were that Wonderland in which Alice sojourned.

The only resort of the court in order to dispose of the cause in a manner which would be intelligible here was to place the United States upon its proof as to the grounds of forfeiture. The proctors for supposed claimant were permitted to contest the proceeding so that all possible objections could be raised and all were.

The court time and again refused to continue the cause to the end of the war or to delay proceedings. There appeared no reason why the United States should be frustrated by continuances in proceedings to forfeit property belonging to non-resident alien enemies, if not to the belligerent government itself.

Subsequently the court decreed forfeiture to the United States for a violation of the statute 40 Stat. 220, 50 U.S.C.A. § 193. The United States Attorney was instructed to draft a form of findings and decree. This draft on submission was substantially the same as the findings which appear in The Mongioia, D. C., 73 F.Supp. 17. The court was of opinion that these findings were insufficient in that there was not enough detail and that there were conclusions rather than findings of ultimate fact.

Thereafter proctors, purporting to represent the claimant, appeared and requested the court to set aside the judgment of forfeiture which had been pronounced but not yet entered on account of the unsatisfactory nature of the findings proposed, as above noted. The opinion of an able judge, Honorable Calvin Chesnut in The Pietro Campanella, D. C., 73 F.Supp. 18, was cited as a basis for retrial and reconsideration.

The court thereupon in the face of this redoubtable authority, reviewed most meticulously the holding in The Leme. The court determined to adhere to the judgment previously announced. The principles which found this conclusion are here set forth.

While the ship was in custody of the United States Marshal under seizure upon

process of this court, the Captain of The Leme, her other officers and the crew were permitted to remain aboard while the private legal proceedings were in the doldrums awaiting evidence. On this ship, to which they each had egress and ingress, the officers and crew entered into a plan, scheme, combination and conspiracy to destroy the motive power and instruments of navigation of the ship. This action so intended is defined as a crime against the United States. The officers and many of the men did assist in battering the engines, smashing the compass and the steering apparatus and destroying other furniture and equipment of the ship. The damage so done was abundantly proven as were the acts leading thereto.

There were photographs introduced in evidence showing the destruction of the gear, equipment, instruments and engines. The testimony of the witness Grunstad, a Columbia River pilot, showed that he moved the vessel by tug down the Willamette River from Northwest Grain Dock to Terminal No. 1, April 24, 1941, when she was "dead" as the result of the damage. He testified that he had moved her up the river on her own power previously in the same year when she was undamaged. He gave a circumstantial account of damage to her instruments. Such testimony was corroborated and cumulated by other evidence. Reithmiller, a watchman employed by the United States Marshal, testified that he came on duty aboard at 6:00 P.M. March 28, 1941. He attempted to go in the engine room and was forbidden to make his usual rounds or to enter the engine room. Upon question, the Chief Engineer said he had special orders from Captain Polonio that no one of the crew should leave the ship and no one was to come aboard. The crew were busy until 12:00 P.M. below and witness heard the engines turning over and subsequently he heard pounding going on underneath the ship, but was unable to find out what was happening. On Saturday night he observed considerable damage had been done to the anchor winch, hoisting winches and cylinder heads. He saw the second engineer and an apprentice officer damaging a winch and attempted to apprehend them but they went to their quarters and he saw them no more that night. The same night the Captain said to the witness under no consideration would he allow this Government to take the ship over "whole"—that he would destroy it and that he had orders to that effect. The damaging of the ship continued until the master and crew were taken in custody by the Coast Guard on Sunday, March 30, 1941. This evidence was all admitted as a part of the res gestae. Witness King of the Federal Bureau of Investigation interviewed Polonio on March 30 after he was removed from the ship in custody and was told by the Captain that Polonio had received orders from persons whom he refused to identify to damage or immobilize the ship. Polonio further said he had thought about damaging the ship for a period of several weeks, possibly thirty days, and that he had discussed it with some of his officers on a prior occasion. He also said he gave orders to the officers to damage the engines which they proceeded to carry out.

This evidence was admitted either under the rule of res gestae or the rule that the master represents the ship and the owners.[1]

Although the court rejected declarations of the crew, the log book, the record in the criminal case against master and crew and other matters upon the theory that the record should be impeccable, there is sufficient here to establish the issues.

The conferences and consultations before the damage was begun are indicated in this evidence. Besides, the program of damage lasted over parts of three days, and in the meantime the crew and officers were sequestered from outside interference while the most effective means of further damage were subject to consideration by them, and thus the agreements were being made and the conspiracy continued while the damage was being done. The Captain and the crew inferentially went on and off the vessel while this plan was being worked out. Certainly the Captain was a person conspiring to commit a crime against the United States.

---

[1] The Potomac, 8 Wall. 590, 19 L.Ed. 511; The Monarch of Nassau, Sawyer et al. v. M. Levin & Co., Inc., 5 Cir., 155 F. 2d 48.

The court takes judicial knowledge of the fact that this was only one phase of a nation-wide conspiracy to damage the motive power of all the Italian-owned ships in American harbors.

The only question involved is whether the ship is forfeitable under the Act of June 15, 1917, 40 Stat. 217–231. The analysis of the statute as a whole by Judge Chesnut is clear and precise. The elimination of all the titles of that Act except Title II is correct. Sections 1 and 2 of Title II, 50 U.-S.C.A. §§ 191, 192, are shown to have no pertinency here. The further distinction between Title III, Section 1 of this Act, 40 Stat. 217, 221, 18 U.S.C.A. § 502, which is a criminal statute and Title II, Section 3, 40 Stat. 220, 50 U.S.C.A. § 193, here in question which is a forfeiture statute has been elaborated upon both by Judge Chesnut and this court. United States v. Polonio, supra.

As to Title II, Section 3, this court is in full agreement with the proposition advanced by Judge Chesnut that since the section makes it unlawful for the master or owner "wilfully to cause or permit" destruction or injury of the vessel "or knowingly to permit said vessel to be used" for other purposes enumerated, but provides for the seizure and forfeiture of a vessel only if "so used", The Leme could not be forfeited under the terms of the statute merely because the master caused or permitted her injury.[2]

The statute may be clarified by diagram as follows:

in case such vessel shall be so used, with the knowledge of the owner or master, the vessel shall be subject to seizure and forfeiture to the United States.

If then the master permitted The Leme to be used as a "place of resort" for any person conspiring with another or proposing to commit an offense against the United States, the ship "so used" could be forfeited.

The facts show that the master permitted The Leme to be used by himself and the crew, each of whom was proven a person who was conspiring with another to injure the vessel, and each of whom was preparing to commit an offense against the United States, namely the injury of the motive power of The Leme. But it is objected that although the master permitted the use, although the use was by the persons specifically denounced by the Act, The Leme is immune because it was not shown the ship was so used as a "place of resort" for such person or persons. The argument is that The Leme was the home of its officers and crew and therefore could not be used as a "place of resort" by *them*.

Even though it was shown by the evidence in The Pietro Campanella that the naval attache of the Italian Embassy went aboard the vessel and had a talk with the crew, it was not found sufficient to show the vessel was a "place of resort". Here there is no direct proof of a visit of so distinguished a personage. The proof does show a nation-wide conspiracy and that directions came to Captain Polonio from

It shall be unlawful for the owner or master
  I. knowingly to permit said vessel *to be used* as a place of resort for any person
    (1) *conspiring* with another
        or
    (2) *preparing*
        (a) to commit any offense
            (x) against the United States
                or
            (y) in violation of the treaties of the United States
        (b) to defraud the United States
  II. knowingly to permit such vessels *to be used*
    (1) in violation of the rights and obligations of the United States under the the law of nations

---

[2] It must be noted however that "use" often denotes misuse or injury cf. "Use, v. * * * 6. To behave toward; to act with regard to; to treat; as, to use a beast cruelly." Webster's New International Dictionary, 2nd Edition, Unabridged.

outside the vessel by means which he refused to explain. But no attempt will be made to draw an inference of the use of the vessel as a place of resort by conspirators from shore.

For the master and crew The Leme was a place used as a means to conspire.[3] To resort to a place has the connotation that one may remain or abide there.[4] Resort may also connote abode. The forest which is the resort of an individual may be a place of refuge but it may also be his home. A place frequented by many is a resort. Even though the many live in the place if they use it they thus frequent it and constitute it a resort.[5] The Leme was the haunt of the crew. Surely also it may be described as a nest of conspirators.[6] The master and crew actually did conspire one with another and actually were preparing as a result of the conspiracy to injure the motive power of the vessel — a crime against the United States. The Leme was the locale where the conspiracy and the preparation to commit the crime took place.

It is with great reluctance that the court disagrees with Judge Chesnut who has illuminated the field of construction of these particular statutes. And it must be agreed that a forfeiture statute should be strictly construed. It should also be freely conceded that the words "place of re-sort" do bear the construction placed upon them by the opinion The Pietro Campanella. The discussion above shows this is not the only construction which the words bear. The cases cited there and the meaning of the phrase "place of resort" occur in the narrowly limited field of dispensing of intoxicating liquors, narcotics and the like. There the keeper is ordinarily the dispenser, the seller the procurer. Other persons resort to the place to indulge themselves. This one context justifies the opinions and the meaning so attributed to the phrase. Under these circumstances the persons who indulge come from the outside and frequent the place. The keeper can not resort to the place for the purpose of buying because he is selling.[7]

But semantics are uncertain guides in the fog created by statutes. A forfeiture statute should be strictly construed. But an enactment of Congress passed on the eve of another war when the atmosphere was charged with rumors of sabotage and espionage, which expressly denounces use of a vessel as a place of resort for anyone conspiring with another, seems self-illuminating. It is difficult to infer that Congress intended to allow the vessel to escape merely because the crew who lived on the ship used it as a place of resort for conspiracy, inasmuch as circumstances would dictate the ship as the place of maximum safety.

---

[3] The dictionary of 1913, Funk Wagnalls New Standard Dictionary of the English Language, which we use because the statute was passed in 1917, defines the noun resort as follows: "1. The act of visiting or frequenting a place; also a place resorted to by an individual, or frequented by many; as the forest is my *resort;* Newport is a fashionable *resort;* the *resorts* of sin.

"2. A betaking oneself for aid or advantage; the use of something as a means; application; recourse; refuge; as reading is his *resort;* a *resort* to court; also the person or thing to which recourse is or may be made; as he is my only *resort.* * * *"

[4] This same dictionary defines the intransitive verb resort as follows: " * * * 6. To remain in a place; abide." Roget's Thesaurus of the English Language treats resort as follows: "resort, n. haunt, retreat, refuge; recourse. See Habitation, Use. Habitation. I *Nouns.*

*habitation,* abode, dwelling, lodging, domicile, residence * * * *retreat,* refuge, asylum, haunt, resort; lair, dugout, den, cave, cavern, grotto, hole, hiding place, cell, sanctum sanctorum * * * Use. I *Nouns,* use, employment, exercise * * *. disposal, consumption; recourse, resort; * * *"

[5] The word "frequent" means to use and "use" is likewise one of its synonyms, Allen's Synonyms & Antonyms.

[6] In Allen's Synonyms & Antonyms "resort" is treated as follows: "3. place (contex.), retreat, haunt, rendezvous; spec. dive, harbor, nest (*as of traitors, etc.),* joint (S), hangout (S), walk, soil (*a miry place of* resort *by deer),* lie (resort *of an animal),* lounge, wallow; *see* Refuge."

[7] Even in this connection the mere fact that the parties live in the place will not prevent it from being a place of resort. State v. Cumberland Club, 112 Me. 196, 91 A. 911.

Nor is it believed that Congress intended to allow the vessel to escape seizure under the statute which made it unlawful for a master to permit the vessel to be used as a place of resort for a person conspiring with another, merely because the master who lived on the vessel was himself a conspirator who himself used the vessel as a "place of resort" for plotting.

The Act provided for the forfeiture of the vessel if the master or owner permitted it to be used as a place of resort for anyone conspiring with another. Under the construction urged, the vessel would be forfeitable if the master permitted persons to come aboard frequently who were conspiring to disable The Leme. But on the other hand, it is urged the vessel would be immune, where the master or crew members received intelligence of a widespread conspiracy to injure all of the Italian ships in the territorial waters of the United States and they, with the permission or participation of the master conspired to disable The Leme. This construction would stultify the purpose of Congress. The ultimate purpose of the statute was to prevent the use of the vessel for a place of conspiracy. A vessel used as a place of meeting of conspiracy was to be forfeited. But if the unnatural construction urged upon us is to be followed, The Leme will escape forfeiture, although she was used as a place to conspire by a large number of men who consummated the conspiracy in a brilliant manner. This conspiracy was carried out with an eye to this construction of the statute. No evasion of the purpose of the forfeiture statute should be permitted where Congress has used words which will bear the purpose out. Otherwise we grasp the shadow and let the substance pass unnoticed.

The United States has established by the heavy weight of the evidence that The Leme was properly seized and was subject to forfeiture under the statute. The order of the court turning possession of the vessel over to the Maritime Commission was in the nature of a stipulation posted by private claimants for release where a vessel is seized since the vessel is forfeit there is neither necessity of requiring her return nor a deposit of her value. The original attachments have been vacated and the cases dismissed.

The court has already dismissed the petitions for fees of proctors claiming to represent the ship.

It must be remembered the acts relating to The Leme were the result of the machinations of the fascist government of Imperial Italy. The hypertechnical constructions of the statutes which lie at the basis of the defense of the individual conspirators in criminal cases and at the basis of the claim that the ships damaged in territorial waters of the United States at ports from New York, Puerto Rico, Texas and the Canal Zone to Oregon as a result of concerted action, were not subject to forfeiture, prove that the legal framework was carefully laid to accomplish the result and avoid the consequences. But these events were a prelude to war. Thereafter the fascist government of Italy, whether appearing as a belligerent or masking as "Italia", an anonymous corporation domiciled in an enemy country, had no standing during the war to urge a claim in the courts of the United States,[8] whether through agents, lawyers or proctors. If payment for such services were to be made, the enemy government would be rewarded for successful sabotage. This disposes of the claim of Mr. Loomis. Local counsel must be held to have acted upon a known contingency if they did not have foresight to get fees in advance.

The decree of forfeiture is affirmed.

---

[8] See Ex parte Colonna, 314 U.S. 510, 62 S.Ct. 373, 86 L.Ed. 379; Manaka v. Monterey Sardine Industries, D.C., 48 F. Supp. 625. See also Wilson v. Miller, D.C., 274 F. 808.