### UNITED STATES v. THE PIETRO CAMPANELLA.

### UNITED STATES v. THE EURO.

Nos. 2498, 2499.

United States District Court
D. Maryland.
Dec. 1, 1948.

476

See also D.C., 73 F.Supp. 18.

Homer L. Loomis, of New York City, pro se.

Bernard J. Flynn, U. S. Atty., of Baltimore, Md., and Thos. F. McGovern, Atty., Admiralty Section, Dept. of Justice, of Washington, D. C., for plaintiff.

David L. Bazelon, Asst. Atty. Gen. and Jos. W. Bishop, Jr., Atty., Office of Alien Property, Dept. of Justice, of Washington,

D. C. (Lloyd N. Cutler and Cox, Langford, Stoddard & Cutler, all of Washington, D. C., of counsel), for Tom C. Clark, Atty. Gen. of United States, as successor to Alien Property Custodian.

Thos. G. Young, Jr. and France, Rouzer, Lentz & Harris, all of Baltimore, Md., for Societa Navigazione Tito Campanella and Societa Navigazione Ligúre Di Armamento, claimants.

CHESNUT, District Judge.

In March 1941, 28 Italian merchant ships were lying idle in various ports of the United States. At that time Italy was at war with France and England but not with the United States. About March 23 of that year the masters and crews of many of these ships respectively, acting on orders of the Naval Attache of the Italian Embassy in this country, intentionally injured or destroyed the machinery and motive power of the ships, to immobilize them and prevent them from possibly falling into the hands of the enemy. For these acts the masters and some members of the crews of the respective ships were indicted in the appropriate federal district courts for violation of section 1, Title III of the Act of June 15, 1917, 40 Stat. 217, 221, 18 U.S.C.A. § 502 [now § 2275]. Upon the trial of the respective cases the defendants in most of them were convicted and the judgments in some of the cases were affirmed by the Circuit Courts of Appeal. Two of these ships, the Euro and Campanella, were anchored in the Baltimore Harbor. The masters and crews of these two ships were prosecuted in this court and judgments against them were affirmed by the Court of Appeals for this Circuit. Bersio v. United States, and Pieraccini v. United States, 4 Cir., 124 F.2d 310. See also Marchese v. United States, 5th Cir., 126 F.2d 671.[1]

On July 19, 1941 the United States filed in this court libels for forfeiture of the Euro and Campanella under § 3, Title II of the Act of June 15, 1917, 50 U.S.C.A. § 193 [now 18 U.S.C.A. § 2274]. Since then there has been a long judicial history of litigation in this court affecting these two Italian ships. Exceptions to the libels were filed and sustained on formal grounds with leave to amend. Exceptions to the amended libels were overruled. D.C., 44 F.Supp. 348. On September 11, 1941 the United States Maritime Commission requisitioned the ships under the authority of the Act of Congress of June 6, 1941, Public Law 101, 77th Cong. c. 174, 1st. sess., H.B.4466, 50 U.S.C.A. War Appendix § 1271. On October 6, 1941 the United States filed petitions in these cases asking the delivery of the ships in accordance wtih the requisition order. This was opposed by the proctor for the claimants of the ships respectively, two Italian corporations. But the court granted the order for delivery of possession on the condition that the ships should remain in the constructive possession of the court under the designation of a master of the ships as a deputy of the marshal. It was also noted that the Act of Congress under which the requisition was made provided that compensation to the owners or claimants was to be secured by deposit of an adequate fund with the Treasurer of the United States, and subject to payment to persons entitled thereto; and also that satisfactory provision had been made for the determination of just compensation in the event of disagreement. See D.C., 41 F.Supp. 656, 657.

In December 1941 war was declared between the United States and Italy. On July 22, 1942, the Alien Property Custodian made a vesting order (No. 52, 7 F.R. 5738) with respect to the ships or the fund to be substituted therefor under the Act of October 6, 1917 as amended, 50 U.S.C.A.Appendix, §§ 5(b) and 7(c), and Executive Order No. 9095 as amended, 50 U.S.C.A. Appendix, § 6 note. Promptly thereafter he filed a petition in these cases praying to be substituted for the claimants or owners of the ships with authority to act as *dominus litis,* and thus potentially excluding the claimants of the ships from further opportunity to defend against the libels for forfeiture. This petition was again opposed

---

[1] In a few of these cases the defendants were acquitted or motions for a new trial were granted. See United States v. Saglietto, D.C., 41 F.Supp. 21; United States v. Martini, D.C., 42 F.Supp. 502.

by the proctor for the claimants with the result that the Alien Property Custodian was allowed to intervene and made a party to the case "with full right to hereafter receive and hold any interest in the ships which the claimants had at the time of the vesting order"; but not with power to act as *dominus litis* to the extent of excluding a defense of the claimants against the alleged forfeiture. A stay of prosecution of the libels for forfeiture was also granted in view of the then existing war and until further consideration of the subject. See D. C., 47 F.Supp. 374.

The progress and determination of the war with Italy is a matter of recent well known history. The litigation affecting the ships was not again brought before the court until after the end of the war when, on request of counsel for the United States, there was a trial of the libels for forfeiture. It then developed that during the war the ships, while being operated by the United States, had been sunk by enemy action. The amount of just compensation to be paid to the United States for the ships had never been ascertained and deposited with the Treasurer of the United States. Probably, by reason of the conditions of active warfare, none of the parties to the case had diligently prosecuted administrative remedies with respect to the determination of just compensation for the ships. The claimed forfeiture of the ships was vigorously defended by the same proctor for the original claimants of the ships. The result of the trial was that this court determined in a lengthy opinion, 73 F.Supp. 18, that under the facts found the ships were not subject to forfeiture under the Act above mentioned relied upon by counsel for the United States. But it was also concluded that the Alien Property Custodian succeeded to the rights in and to the fund which the claimants had at the time of the vesting order of July 22, 1942 subject only to the undecided question whether the proctor for the claimants "have a lien upon the fund for professional services". During the hearing an Italian representative of the claimants appeared in court and then stated their position to be that they did not wish to further oppose the claims of the United States, but the authority of this representative was then challenged by the proctor who had previously been acting for the claimants throughout the litigation, and the evidence then submitted was not sufficient to determine whether the representative, an Italian citizen temporarily in this country, was authorized to speak for the claimants.

It thus appears from this recital that the only remaining question in the case is whether the proctor mentioned, Mr. Homer L. Loomis, is entitled to an award for a proctor's fee out of the fund which under the legislation above mentioned was to be available in substitution for the ships themselves. But before the consideration of this particular question, it is necessary to mention two other events which have recently occurred affecting the matter.

Congress passed a point resolution, Public Law 370, 80th Cong. c. 49, 1st sess., approved August 5, 1947, entitled "To provide for returns of Italian property in the United States, and for other purposes". This resolution amended in certain respects § 32 of the Trading with the Enemy Act, 50 U.S.C.A.Appendix, § 32 (not the Volume entitled War-Appendix). It recited art. 79 of the Treaty of Peace with Italy on February 10, 1947, which provided that the United States might retain all property rights and interest within this territory belonging to Italy or Italian Nationals, and apply such property or the proceeds thereof to such purposes as it may desire, within the limits of its claims and those of its Nationals against Italy or Italian Nationals, and that all Italian property or proceeds thereof in excess of the amount of such claims should be returned; and that pursuant to art. 79 of the Treaty negotiations have been entered into between the United States and Italy looking to an agreement under which upon return of Italian property Italy would place at the disposal of the United States funds to be used in meeting certain claims of Nationals in the United States, and that for the purpose of carrying out the agreement it is desirable to authorize, in accordance with the procedure provided for in § 32 of the Trading with the Enemy Act of October 1917 (40 Stat. 411 as amended), the return to Italy or citizens or subjects of Italy, property vest-

ed in or transferred to the United States or its agencies, and that for the purpose of aiding the revival of Italian economy it is desirable to return to Italy vessels acquired by the United States after December 4, 1941, still owned by the United States, and transfer to Italy vessels of a total tonnage approximately equal to the tonnage of those Italian vessels received or seized by the United States after September 1, 1941 and lost while employed by the United States in the war effort. Section 1 of the resolution, authorized the President or such officer or agencies as he might designate to return such property, and § 4 of the resolution, provided as follows: "The President is authorized upon such terms as he deems necessary (a) to transfer to the Government of Italy all vessels which were under Italian registry and flag on September 1, 1939, and were thereafter acquired by the United States and are now owned by the United States; (b) with respect to any vessel under Italian registry and flag on September 1, 1939, and subsequently seized in United States ports and thereafter lost while being employed in the United States war effort, to transfer to the Government of Italy surplus merchant vessels of the United States of a total tonnage approximately equal to the total tonnage of the Italian vessels lost: *Provided* that no monetary compensation shall be paid either for the use by the United States or its agencies of former Italian vessels so acquired or seized, or for the return or transfer of such vessels or substitute vessels."

Pursuant to this resolution the President, by Executive Order No. 9935 dated March 16, 1948, See 13 F.R. 1395, authorized the Attorney General and the United States Maritime Commission to designate and transfer to the Italian Government 15 surplus Liberty ships having a total tonnage approximately equal to the total tonnage of vessels under Italian registry and flag on September 1, 1939 and subsequently seized in United States ports and thereafter lost while being employed in the United States war effort. These deliveries of ships were, however, to be made only pursuant to an agreement between Italy and the United States containing provisions consistent with the resolution of August 5, 1947, and providing among other things that Italy should agree to discharge and save harmless the United States from any liability with respect to any claims *"to or against the vessels"* so transferred or the lost vessels in respect of which substituted vessels are tranferred; and of the 15 surplus Liberty ships so to be transferred the Maritime Commission should retain such number as would constitute security for the payment of such sums of money as the Attorney General might determine sufficient for the payment, settlement and satisfaction of any claims not otherwise secured to or claimed against the lost vessels in respect of which the substituted ships are being transferred.

In accordance with this Executive Order Italy and the United States did enter into an agreement which provided that Italy for itself and its Nationals or corporations, waived any claim for compensation or damages with respect to the said vessels or the use thereof (including those lost and those not lost) and agreed further to indemnify the United States against any such claims or demands by whomsoever asserted. On April 2, 1948 the Attorney General did by written instrument formally transfer nine of the ships to Italy.

To summarize thus far. (1) The Euro and Campanella were not subject to forfeiture under the libels in this case; (2) before war between the United States and Italy the United States requisitioned the ships under lawful legislation providing for just compensation to be determined primarily administratively or, if necessary, ultimately judicially; (3) after the outbreak of war between the United States and Italy the Alien Property Custodian seized the ships or any interest of the claimants therein, or in the just compensation to be paid in substitution for the ships, by a lawful vesting order; (4) during the war the vessels were lost by enemy action; (the value of the ships or just compensation for their requisition has never been determined either administratively or judicially); (5) after the war Congress has authorized delivery to the Italian Government of surplus Liberty ships of approximately equal tonnage with the Euro and Campanella on condition of waiver of any

claims by the Italian Government or its Nationals for the taking of the ships by the United States and on the further condition of paying or satisfying or otherwise discharging any and all valid claims against the ships and indemnifying the United States against any possible liability to persons having such valid claims.

It is to be noted that presently the question whether the ships were subject to forfeiture at the suit of the United States has lost the practical importance that it might otherwise have had as between the United States and the claimants of the ship (see D.C., 47 F.Supp. 374, 377). It is now, by reason of what has recently taken place, apparently only of academic interest, except with regard to the one remaining question in the case, relating to the claim for a proctor's fee. With this necessarily long introduction I now come to this particular remaining question.

On October 1, 1942 Mr. Homer L. Loomis, the proctor referred to, a New York lawyer also admitted to practice in this court, together with his associated Baltimore counsel, Messrs. Brown and Brune, filed petitions in these cases for an allowance of fees. In these petitions they recited that in July 1941 they had been retained on behalf of the claimants, Italian corporations as owners of the vessels, to appear and defend the suits and pursuant thereto they had rendered extensive legal services in the litigation necessarily incurring therein substantial disbursements; and also that in April 1941 they had been retained by and on behalf of the owners of the ships to conduct the defense of the masters and members of the crews in the criminal cases against them heretofore mentioned, including the appeals therein; and were also retained to defend the masters and members of the crew of the ships in proceedings conducted by the Department of Immigration for their deportation. The petition also pointed out that the owners of the ships for whom the professional services had been performed, had no other property than the ships in the United States from which compensation could be obtained. The petition also referred to professional services required with respect to the claim of the Alien Property Custodian

under the vesting order. The court is, of course, aware of the subsequent professional services continued to be performed in these cases by Mr. Loomis as will appear from the reported opinions above cited. Here it should also now be added that recently Messrs. Brown and Brune, local Baltimore counsel who joined in the petition, have been paid for their services by or on behalf of the former owners of the Euro and Campanella and therefore have no further claim in the matter. The claim of Mr. Loomis is, however, vigorously pressed. What he asks for is a determination by this court of a reasonable fee for all his professional services throughout this litigation, including services in the criminal and deportation cases, and an order of court for the payment thereof by the United States as an allowance out of the fund which should have been determined as just compensation for the taking of the ships under the requisition order. The claim is resisted by the Attorney General of the United States as counsel for the United States as libellant in these cases and also in his capacity as having been duly substituted for the Alien Property Custodian. The claim is now also presently opposed by the former owners of the ships who, by reason of the above recited developments after the war do not wish in any way to further oppose the United States in the litigation.

The opposition to the claim is based on numerous grounds involving first an issue of fact and secondly issues of law. The question of fact involves the contention that Mr. Loomis was not originally or at any later time employed or retained by the former *owners* of the ships. Relevant to this matter of fact much evidence has been adduced pro and con. The evidence shows without real contradiction, and I understand is really not disputed, that shortly after the sabotage of the ships in March 1941 Mr. Loomis was retained as counsel by the Italian Line with offices in New York City, then acting as a general ship agency for Italian vessels, and by the Italian Ambassador at Washington, for the defense of the masters and members of the crew who had been indicted, and subsequently for the defense of the libels for forfeiture filed by the United States. This retainer and em-

ployment was not only on account of the ships in the Baltimore Harbor but all the other ships or crews thereof who or which were involved in similar litigation in other district courts of the United States, including, I understand, Boston, New York, Norfolk, Texas, Oregon and possibly other ports. Mr. Loomis and his local associates in other courts vigorously defended all the cases and received some fees and advances for expenses and disbursements from the Italian Embassy at Washington prior to the war between the United States and Italy. Just about the time of the beginning of the war Mr. Loomis had asked the Italian Embassy for a further advance of $50,000; but this was not received by him. After the outbreak of the war he was unable to communicate with the Italian Ambassador but did confer to some extent with the Swiss Legation in Washington which had taken over the affairs of the Italian Embassy. Mr. Loomis states that despite the war between Italy and the United States he regarded it as a high professional duty to continue the defense of the litigation which has involved further substantial disbursements which he would have been unable to defray except for a loan made to him by a friend. He has received no further compensation for his services and disbursements in any of the cases but recently he understands that all his local associate counsel in the various cases have been paid by or on behalf of the former owners of the Italian vessels. And indeed very recently an offer has been made to pay him $50,000 from the same source but he has declined the offer on the ground that it is entirely inadequate. He considers that in this one case in this court a reasonable fee for his services should be approximately $300,000, of which he estimates that $50,000 would be only a fair allowance for his services in the criminal cases in this court and on appeal. He points to the large value of the two ships which, though not heretofore definitely determined* were, he says, worth well over $1,000,000. He states that for the proper defense of all the litigation in this court he has spent 1,433⅓ hours of his professional time with unpaid disbursements of $1,113.92 here in the civil cases. Up to December 31, 1941 he had spent 247 hours in the cases in this court, of which about 75% was for the criminal cases including the appeals. He also points out that his local counsel, Messrs. Brown and Brune, have been paid $12,500 for their services here although the whole of their work had been under his supervision and the great bulk of the professional work had been individually performed by him.

█ While it is not disputed that Mr. Loomis was professionally employed by the Italian Ambassador and by the Italian Line, it is now contended that he was never in fact employed or retained by the Italian corporations who were the owners of the Euro and Campanella. There is much evidence bearing on this issue of fact. I think it unnecessary to review it in detail. But I find as a fact that he was retained and employed either expressly or impliedly by the owners who have accepted the benefit of his professional services. He was undoubtedly expressly retained by the Italian Embassy and the Italian Line. The evidence convinces me that the relations between the Government of Italy and the Italian corporations as owners of the ships were such as to imply authority in the Italian Ambassador to act for the ship owners. The motive power of the ships was wilfully damaged by the masters and crews on direct orders from the Italian Embassy and this was an action dictated by policy in the interest of the Government of Italy to which the Italian corporations as owners of the ships were subject. Furthermore, the claims of these Italian corporations as owners of the ships were filed in this case signed by the masters of the ships and by Mr. Loomis as counsel. It is true the masters were at that time not on the ships and were under arrest in the criminal cases; but I am satisfied from the evidence that reports must have been made through the Italian Embassy from which the Italian corporations became aware of the proceedings here. It was to their interest and advantage to have the cases defended by Mr. Loomis. There was no attempted repudiation of authority until about May 1947 when a Mr. Guani, a director of one of the Italian corporations and also a member of an Italian Commission to the United States to negotiate with regard to the return or

replacement of the ships, came to the United States and employed independent local counsel in attempted substitution for Mr. Loomis. And it was not until February 16, 1948 that there was a direct written repudiation of Mr. Loomis' authority to continue the defense of the litigation. At that time, of course, the interests of the former owners of the ships had obviously materially changed. There is a seemingly further ratification of the employment of Mr. Loomis by the offer of Mr. Guani to pay Mr. Loomis $50,000 from a general fund which has been contributed by the owners or the former owners of the 28 Italian ships, on a percentage basis with respect to the tonnage of the several ships, and the payment of fees to his associated local counsel.

I come now to the legal objections to the allowance of the claim. It is not contended by Mr. Loomis that he is the holder of a maritime lien as such against the ships. Nor does he advance the contention that in connection with his employment it was agreed that he should have any lien or claim on the ships themselves. His legal contention in support of his claim is put upon several possible grounds: (1) That the allowance can be made to him on the principle of "taxation of costs between attorney and client"; (2) that though he does not have a specific maritime lien against the ships he has an equitable lien or claim which, in this case, should be treated as equivalent to a maritime lien in that he had directly or indirectly by his professional services in defense of the litigation created an actual or potential fund of large value for the benefit of the owners, in that the Italian Government, presumably for their benefit, is to receive Liberty ships of an equal tonnage in lieu of the Euro and Campanella; and (3) it is contended by Mr. Loomis that the effect of the agreement between the United States and Italy for the return and substitution of the ships, pursuant to the general resolution of August 5, 1947, on condition of the waiver of any claims for damages by Italy or its Nationals, and the agreement to indemnify the United States against loss or liability by reason of claims against the ships is constructively the creation of a fund for the benefit of his clients from which he should be compensated; and that a decree in personam against the United States for his fee would under the agreement between the United States and Italy, have to be ultimately paid by the Italian Government or the shipowners as the United States has required indemnity against all claims against the ships which it might otherwise be required to pay.

The Attorney General advances numerous legal propositions in opposition to the claim, but before considering them it is relevant to note that the question here is not whether Mr. Loomis is entitled to receive reasonable compensation for his services, at least up to the outbreak of the war in December 1941, but whether, under all the facts and circumstances, *this court has the authority* to make an award for his services *in this proceeding by decree in personam against the United States.* It is clear enough that Mr. Loomis has other adequate legal remedies for his compensation. The Italian Line which, it is not disputed, did employ him, is still operating in New York and presumably at least is solvent; and apparently could be sued by Mr. Loomis in New York State or federal courts. Furthermore, the Italian corporations, the former owners of the ships, are said to be still functioning and operating ships from time to time between Italy and the United States, and it would appear clear enough that they could respectively be sued by Mr. Loomis by attachment or otherwise. He can also sue under § 34 of the Trading with the Enemy Act, infra. Nevertheless the claimant vigorously contends for compensation in this particular proceeding, emphasizing the point that the value of his services can best be appraised by a judge in the court before whom the litigation has occurred over a period of years. As to this, perhaps I should at once say that being necessarily quite familiar with the aspects of the litigation that have occurred in court as evidenced by the several opinions in the cases heretofore referred to, the amount of the fee claimed by Mr. Loomis as reasonable would seem to be far beyond any allowance that could be made if otherwise proper. Particularly I do not think I could possibly make any allowance in this case

for professional services in defense of the criminal cases; and although Mr. Loomis was clearly employed prior to the occurrence of war in December 1941, it is far less clear that he was necessarily employed for continuation of services thereafter.

■ On the whole case, my *conclusion of law* is that this court does not have authority to allow the claim advanced by Mr. Loomis. I think it is a sufficient answer to the claim to point out that heretofore it has been determined by this court that the vesting order by the Alien Property Custodian on July 22, 1942, resulted in the transfer to the Alien Property Custodian of all right, title and interest of the former owners of the ships either in the ships or the fund to be substituted therefor, excepting only valid claims of others than the owners against the ships; and in my opinion no such claims could be enforced against the ships or the funds in substitution therefor in this proceeding other than claims amounting to maritime or other specific valid liens against the ships. Any other claims against the shipowners would have to be prosecuted in accordance with the provisions of § 34 of the Trading with the Enemy Act, 50 U.S. C.A.Appendix, § 34, which provides for a suit against the Alien Property Custodian in a jurisdiction other than this court. See also §§ 7(c) and 9(f) of that Act, 50 U.S.C.A.Appendix, §§ 7(c), 9(f). As Mr. Loomis does not have such a lien upon the ships the Alien Property Custodian therefore became entitled by the vesting order to the whole interest in the ships or in the fund to be substituted therefor. It seems well settled that a proctor in admiralty obtains no lien on a vessel for professional services to the vessel owner in defending the vessel. Gray v. Hopkins-Carter Hardware Co., 5 Cir., 32 F.2d 876; Johnson Lighterage Co., No. 15, 3 Cir., 248 F. 74; The Jeanette, D.C.Fla., 9 F.2d 408 (on somewhat comparable facts). As the proctor in this case obtained no lien upon the ships, it is unnecessary for the determination here to discuss other questions of law raised by the parties; but nevertheless, in the event of an appeal, it may be desirable to briefly consider some of them.

■ In the first place, it is suggested by the proctor that an award for fees could properly be made on the theory of allowing damages against the United States for the seizure of the vessels under the libels for forfeiture which have not been sustained by the proof. In some early admiralty cases such an allowance has been made. The Apollon, 9 Wheat. 362, 379, 6 L.Ed. 111, Canter v. The American Ins. Co., 3 Pet. 306, 7 L.Ed. 688, but later cases are to the contrary. Flanders v. Tweed, 15 Wall. 450, 452, 21 L.Ed. 203; The Baltimore, 8 Wall. 377, 19 L.Ed. 463; Vol. 3 Benedict on Admiralty (6th Ed.) ss. 421, 423, 424. Anyhow that theory cannot be properly applied here for a number of reasons. It does not appear that the vessel owners suffered any damage by a wrongful seizure by the United States. The motive power of the ships was disabled about March 23, 1941 and, as I recall the evidence of some years ago, the ships were promptly thereafter taken into protective custody by the Coast Guard as they were in their then condition a potential hazard to navigation in the Baltimore Harbor. The seizure under the libels for forfeiture was made on July 19, 1941 and the ships were lawfully requisitioned by the United States on September 11, 1941. The subsequent vesting order of July 22, 1942 transferred to the Alien Property Custodian all the interest either in the ships or in any fund which would be substituted therefor. Therefore it does not appear that between July 19, 1941, the date of the filing of the libels, and October 6, 1941, the date of the order of court giving effect to the requisition, any damage had accrued to the ships or the shipowners over and above what had been done by the master and crew before possession of the ships was taken by the United States. Moreover, even if there had been any damage accruing during this period it was most formally waived or abandoned by the joint resolution of Congress of April 5, 1947, and the agreement between the United States and Italy thereafter. And there is no doubt that such disposition of the matter by the United States was entirely lawful and valid. Cummings v. Deutsche Bank, 300 U.S. 115, 57 S.Ct. 359, 81 L.Ed. 545.

■ Another theory advanced by the proctor is that the allowance of his fee can be based on the equitable principle of the

allowance of costs "as between solicitor and client", the history, development and proper application of which has recently been explained by Mr. Justice Frankfurter in Sprague v. Ticonic Bank, 307 U.S. 161, 165, 59 S.Ct. 777, 83 L.Ed. 1184. But, as there pointed out, this equitable power and practice (distinguished of course from taxation of costs "between party and party")— (see also Trustees v. Greenough, 105 U.S. 527, 26 L.Ed. 1157) is applicable only where a party litigant has at his personal expense and by his efforts succeeded in bringing into court a fund to be shared not only by himself but by others in a common situation. In such a case it may be fair and equitable to allow out of the fund a certain sum, at the expense of all, to reimburse in whole or in part, by way of allowance of counsel fees or otherwise, the active litigant's expenses. But this practice obviously cannot be applied in this case, if it were otherwise applicable, by reason of the fact that there is no fund actually in court.

Against this very practical fact Mr. Loomis advances two arguments. One is that it should be considered there is a "constructive fund" by reason of the statutory conditions relating to the requisition of the ships; and that the United States should be estopped to dispute this by reason of the delay in determining the compensation to be paid for the ships. But this view is not tenable. The requisition was entirely lawful and the delay is readily explainable and excusable by reason of the shortly occurring war. And in any event just compensation for the ships was to be determined first administratively and if necessary thereafter judicially, before the amount of the fund could be determined. This has never been done owing to the war. Moreover, even if there were in fact a fund arising under the requisition act it would be applied by the terms of that act, to the "payment of the amount of any valid claim by way of mortgage or maritime lien or attachment lien upon such vessel, or of any stipulation therefor in a court of the United States," 50 U.S.C.A.Appendix, § 1271. Mr. Loomis does not have such a claim.

■ Another argument is perhaps more plausible. It is based on the contention that the agreement between the United States and Italy for the return or replacement of the ships has in effect constituted a fund for the benefit of the shipowners. And attention is called to the provision of the agreement that Italy would indemnify and secure the United States against all liability for claims *against the ships* and, in the case of ships to be returned as distinguished from those to be replaced, against claims of our Nationals. In the instant case we are not dealing with ships to be returned and therefore the particular provision of the agreement applies only with respect to claims against the ships. As we have seen, Mr. Loomis has no lien or claim on the ships themselves. It is argued that the provision for indemnity and security should be treated as an equitable lien against the ships or the constructive fund for their taking or against the value of the Liberty ships to be substituted for the Euro and Campanella. I find nothing in the agreement to warrant this contention. The agreement made after the war could not be effective to retroactively create a lien against the ships adverse to the interest obtained by the United States under the vesting order of July 22, 1942, of the Alien Property Custodian. Furthermore, it was obviously the intention and effect of the agreement that all claims which might otherwise have existed arising from the taking of the ships should be abandoned and released.

■ In addition to an extended oral argument Mr. Loomis has filed an extended brief which has been duly considered. One of the points therein stressed is that his professional services should be regarded as having been rendered to the ships. It is true that in admiralty law a ship is personified for some purposes, but I know of no authority to support the proposition that the ship is liable in rem for a proctor's services rendered to the ship owner, in the absence of a specific agreement to that effect, which is not claimed in this case. Other arguments are advanced in the brief but in view of what has already been said it seems unnecessary to consider them further, as the grounds for the decision here made have been stated. All that it is necessary to now decide is that this court does not have the authority in this proceeding to

determine the amount of the proctor's fee and to make an award of a money amount therefor against the United States. Persuasive support for this conclusion can be found in the opinions of other District Judges who have considered the same question in other cases affecting some of the Italian ships, and have held that Mr. Loomis' claim for a proctor's fee could not be allowed in the cases respectively. Thus it has recently been so held by Judge Bryan in Virginia. The San Giuseppe,[2] 1948 A.M.C. 78, and The Laconia and The Guian, D. C. E.D. Va. 1948, 81 F.Supp. 661, and by Judge Smith in New Jersey in The Brennerro, D.C., 53 F.Supp. 441, and on appeal The Antoinetta, D.C., 153 F.2d 138, certiorari denied 328 U.S. 864, 66 S.Ct. 1369, 90 L.Ed. 1634. See also Judge Fee's opinion in Oregon in the case of The Leme, D. C., 77 F.Supp. 773, 778.

For these reasons I conclude that the petitions for proctor's fee must be dismissed. Counsel may present the appropriate order in due course.

---

[2] No opinion for publication.